Andre Stanley **DEPUTY**, Defendant
Below, Appellant,

v.

**STATE of Delaware**, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: May 7, 1984.

Decided: July 31, 1985.

·Gary R. Dodge (argued), of Dodge & O'Brien, P.A., Dover, and Dean C. Johnson, Lewes, for appellant.

Gary A. Myers (argued), Georgetown, John A. Parkins, Jr. (argued), Wilmington, and Dana C. Reed, Dover, Department of Justice, for appellee.

Catherine B. Hagerty, Wilmington, and John Williams, Dover, for American Civil Liberties Union of Delaware, Inc., as amicus curiae.

Before HERRMANN, C.J., McNEILLY, HORSEY, MOORE and CHRISTIE, JJ., constituting the Court en banc.

HERRMANN, Chief Justice, HORSEY, MOORE and CHRISTIE, Justices:

Andre Stanley Deputy was convicted of two counts of intentional murder, two counts of felony murder, one count of first degree robbery, and one count of possession of a deadly weapon during the commission of a felony, all arising from the deaths and robbery of Alberta and Byard Smith.[1] Following a separate penalty hearing, the defendant received the death sentence for each of the four first degree murder convictions.

In this appeal Deputy sets forth numerous grounds which he contends require reversal of the judgments entered in both the guilt and penalty phases of his trial. A principal contention is that the defendant's Sixth Amendment right to counsel was violated when he was further interrogated by the State police after a committing magistrate had remanded him to the custody of prison authorities in lieu of bail. Although the defendant had made a prior statement before his appearance in court, at the later interrogation after his committment a second statement was given, which provided essential evidence to sustain his conviction on the two intentional murder charges. Given the nature of this constitutional violation, we must conclude that the defendant's second statement to the police in which he confessed to the crime was, therefore, improperly admitted at his trial. We accordingly reverse the defendant's intentional murder convictions but find the error harmless as to the felony murder convictions. Because we find no merit in any of the defendant's other contentions, we conclude that the felony murder convictions

---

1. Deputy's co-defendant, William Henry Flamer, was tried separately and convicted of the murders outlined herein. Flamer received the death penalty. Upon appeal, this Court affirmed. *Flamer v. State,* 490 A.2d 104 (1984).

and the death penalty imposed for those convictions should be affirmed.

## GUILT PHASE

### I.

The State's evidence revealed the following:

Early in the morning of February 7, 1979, the Delaware State Police, stationed at Troop 5 in Bridgeville, received a report of an apparent double homicide west of Harrington, Delaware.

Detectives Chaffinch and Calloway responded to the report. When they arrived, police officers from the Harrington Police Department were already at the scene, along with the decedents' son, Arthur B. Smith, who had discovered the bodies of his parents, Byard and Alberta Smith, upon entering the house.

His parents, an elderly couple, had been brutally stabbed to death. Mr. Smith, who was 68 years old, 5'6" tall and weighed 150 lbs., had received 79 separate stab wounds. His wife, who was 69 years old, weighed 70 lbs. and was 5'4" tall, had sustained 66 separate stab wounds. The wounds each victim sustained varied in size. From the size of the wounds, the medical examiner was subsequently able to determine that each had been stabbed with two weapons—a bayonet-type knife and a smaller knife.

The police found certain items missing from the couple's home. First, Smith had noticed that his father's car was missing from the driveway. The television set was also gone, its antenna cable apparently cut with a knife. Bags of frozen food were strewn about the scene. Police found the watchband pin of a watch as well.

While they were investigating the scene, the two detectives received a report that the car belonging to the deceased had been located north of Felton, Delaware. Interviews of Felton area residents yielded a description of the man believed to have abandoned the car earlier that morning. A Smith family member told police that the description matched that of William Henry Flamer, a nephew of the deceased who lived near the Smith residence with his grandmother and the defendant, Deputy.

When the detectives went to Flamer's home, his grandmother told them that Flamer was not there; nor, did she have any knowledge of his whereabouts. She permitted police to search the second floor of the house for Flamer. They discovered brown paper bags containing items of frozen food similar to those found at the Smith residence. In addition, the police seized a bayonet, stained with what appeared to be dried blood, and a bayonet sheath. In a first-floor closet, the detectives found a television set, the cable from which matched the piece of cut antenna cable left in the Smith residence.

Based on this evidence, the detectives obtained a warrant for Flamer's arrest. While at Justice of the Peace Court 6, the detectives received a report that Flamer had been seen at the Blue Moon Tavern, south of Woodside, Delaware, on Route 13. Three State police detectives, accompanied by two Harrington police officers, drove to the Blue Moon Tavern.

One of the detectives recognized Flamer, walking down Route 13 with two companions, Ellsworth Coleman and the defendant, Andre Stanley Deputy. All three were stopped and frisked for weapons; although the police felt a wallet in Deputy's back pocket, they did not remove it. All three were read *Miranda* warnings. Flamer was arrested pursuant to the warrant. When asked if he had any identification, Deputy replied that he did not. When asked his name, Deputy replied in an "evasive" manner, lying about his identity, although the police were unaware of the misrepresentation at the time. All three were taken into custody at 3:15 p.m. and were transported to Troop 5, arriving at 4:00 p.m.

Upon arriving at Troop 5, Flamer told the police that Deputy had awakened him that morning and asked him to accompany

Deputy to the Smith house to remove some food. There, Flamer said, he found the Smiths dead. At the same time, other detectives interrogated Deputy. He was read his *Miranda* rights, which he indicated he understood. When asked if he wished to see·an attorney, Deputy made no response. In Deputy's coat pocket, police found a wallet belonging to Byard Smith. They also found two watches, one of which was missing its watchband pin. Deputy told police that Flamer had given him the wallet.

Based on Flamer's statement and Deputy's possession of the victim's wallet and watch, which was missing a watchband pin like the one found at the scene, Deputy was arrested at approximately 4:30 p.m.

Because Flamer and Deputy had given conflicting stories as to the other's involvement in the murders, police continued their questioning. At approximately 6:00 p.m., Flamer revealed Deputy's true identity and stated that Wilmington police had an outstanding murder warrant for Deputy's arrest. After verifying that information, the State Police arrested Deputy on that warrant at approximately 7:00 p.m. The police then provided dinner for the two men.

During questioning that evening, Deputy told Detective Chaffinch that he was telling the truth. Chaffinch did not believe him,

however, and asked Deputy to take a polygraph test. Deputy agreed. Due to a snow storm[2] and Detective Chaffinch's desire to question him further, Deputy did not make his initial appearance before a judicial officer that day[3] and was held overnight at the Bridgeville Police Department.

The police transported Deputy to Troop 5 at approximately 9:00 the next morning. A polygraph test was administered two hours later. Before undergoing the test, Deputy signed a written form acknowledging the *Miranda* warnings. He did not request a lawyer.[4] When the examiner told Deputy that he had failed the polygraph, Deputy told police that he had accompanied Flamer to the Smith's residence to obtain some money. When an argument ensued, Flamer began stabbing Byard Smith. Alberta Smith had begged Deputy to stop the attack, but Deputy did nothing and went home. Detective Chaffinch then taped Deputy's statement.

Detective Chaffinch took Deputy before the Justice of the Peace for his initial appearance at approximately 2:00 p.m. At that hearing, Deputy was again read his *Miranda* rights and told of the penalties he faced.[5] The Justice of the Peace then committed Deputy to the Sussex Correctional Institute (hereinafter "S.C.I."), in default of bail.

---

**2.** As a result of heavy snowfall, the Harrington Justice of the Peace had closed at 4 p.m. To bring the defendant before a committing magistrate that night would have necessitated a drive to Dover under hazardous conditions.

**3.** Super.Ct.Crim. R. 5(a) provides, in pertinent part:

(a) Initial Appearance. An officer making an arrest with or without a warrant or any other authorized peace officer shall take the arrested person without unreasonable delay before the nearest available Justice of the Peace of the county in which the offense is alleged to have been committed, a judge of the Municipal Court for the City of Wilmington, or the court out of which the warrant issued in accordance with the command of the warrant.

**4.** The detective who administered the test testified at the suppression hearing as follows:

Q. If the defendant asked for a lawyer would he [have] been given [a written waiver form] to sign?
A. No. We would have stopped. Had he asked for an attorney there would have been no questions. We would have continued no further.

**5.** J.P.Crim.R. 2(b) provides:

(b) Statement by the Committing Justice of the Peace. The committing Justice of the Peace shall inform the defendant of the complaint against him, of his right to retain counsel, and of his right to have a preliminary hearing. He shall also inform the defendant that he is not required to make a statement and that any statement made by him may be used against him. The committing Justice of the Peace shall allow the defendant reasonable time and opportunity to consult counsel and shall admit the defendant to bail as provided in these rules.

Deputy was taken back to Troop 5 to await transportation to S.C.I. At Troop 5, Detective Chaffinch questioned Deputy briefly while arrangements were made to commit Deputy to prison. Uniformed officers then left with Deputy headed for S.C.I.

However, Detective Chaffinch ignored the judicial commitment order and directed the officers to bring Deputy back to Troop 5 for further questioning in light of discrepancies in Deputy's story and new information provided by Flamer. After the polygraph, Deputy had stated that he had gone to the Smith's to obtain money, but had left when the stabbing started, without having obtained any funds. Yet, when he was taken into custody, he had $25 in his pocket. Therefore, Chaffinch wondered why Deputy needed to obtain money from the Smith's when he already had funds. Moreover, while Deputy was making his appearance before the magistrate, Flamer had told police that both he and Deputy had participated in the stabbings, using two knives. Police then located the second knife at the scene of the arrest.

On cross-examination, Chaffinch admitted that he violated the judicial commitment order because "[he] wanted to try to get the correct statement from him." He testified further:

Q. What would you characterize as a correct statement?
A. Truth.
Q. A confession?
A. Yes, you could say that.

Deputy arrived back at Troop 5 at about 4:30 or 5:00 p.m. and Detective Chaffinch questioned him briefly about these concerns. Chaffinch then departed for a meeting in Seaford, but he told Deputy that he would continue the questioning when he returned in about one hour. Chaffinch testified that he told Deputy:

When I come back we will sit down and get the whole truth and put it on a taped statement and you will be taken to S.C.I.

Deputy was held in a jail cell until approximately 9:30 that night when Chaffinch returned. Chaffinch talked to Deputy "... [a]bout getting the truth. About telling the truth about the incident." At 9:50 p.m., Deputy gave another taped statement during which he confessed his involvement in the crime.

At that time Deputy said that he and Flamer had gone to the Smith's to obtain money. The Smiths refused and an argument ensued. Flamer began stabbing Byard Smith and Alberta Smith begged Deputy to stop the attack. Deputy got the knife from Flamer and stabbed Alberta Smith. Flamer continued to stab Byard Smith using another knife. After Deputy stabbed Alberta Smith, she appeared to be dead, and Deputy returned home. Shortly thereafter, Flamer arrived carrying items from the Smith's home. He gave Deputy some money. Deputy said that he killed Alberta Smith out of fear that she would report them to the police.

Deputy had again been read the *Miranda* warnings before the questioning began. After Deputy had completed his statement, he was asked about his understanding of his *Miranda* rights:

Q. O.K. Have you been explained your *Miranda* rights, your right to be silent and rights to an attorney and all that?
A. Yes.
Q. How many times have you been told that, since you've been apprehended?
A. About 2 or 3.
Q. Have you been asked if you want to see an attorney?
A. Yes.
Q. Have you had an opportunity to talk to an attorney if you wanted to see one?
A. Yes.

Deputy moved to suppress all evidence seized from him and all statements made during his period of detention. After a hearing, the Superior Court granted the motion to suppress. The State of Delaware appealed to this Court. We reversed, finding the initial detention pursu-

ant to 11 *Del.C.* § 1902[6] to have been lawful. *State v. Deputy*, Del.Supr., 433 A.2d 1040 (1981).

After a jury trial, Deputy was convicted of two counts of intentional murder, two counts of felony murder, one count of robbery in the first degree and one count of possession of a deadly weapon during the commission of a felony.

## II.

### A.

As noted above, the defendant made two incriminating statements which were recorded by the police; one was made prior to and one after his initial appearance in the Justice of the Peace Court. Both statements were challenged by the defendant, first, at the suppression hearing, and later at trial. Following the remand by this Court, the trial court decided that the statements were made voluntarily and were properly obtained by the police. The defendant asserts that the trial court erred in its determination.

The defendant contends that his first recorded incriminating statement, made on the morning of February 8th, was admitted into evidence in violation of Superior Court Criminal Rule 5(a).[7] His statement, which

established defendant's presence at the Smith residence at the time of the murders, was made about 20 hours after he was first taken into custody. Relying upon *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), the defendant argues that the length of his detention prior to the statement should have rendered the statement inadmissible.

■ This Court adopted the *McNabb-Mallory* rule[8] in *Vorhauer v. State*, Del. Supr., 212 A.2d 886 (1965), and decided to exclude evidence obtained during a detention which exceeded the 24 hour period specified in the 11 *Del.C.* § 1911.[9] In *Vorhauer*, it was held that any detention exceeding 24 hours would be considered an unreasonable delay, and an illegal detention as a matter of law, unless the delay met the section's permissible delay criteria. Any inculpatory statements made during the illegal detention would be rendered inadmissible.

Faced with a delay of less than 24 hours in *Webster v. State*, Del.Supr., 213 A.2d 298 (1965), this Court stated that:

[A] delay may be "unreasonable", and in violation of the Rule and the Statute,

---

**6.** 11 *Del.C.* § 1902 provides:

(a) A peace officer may stop any person abroad, or in a public place, who has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand of him his name, address, business abroad and where he is going.

(b) Any person so questioned who fails to identify himself or explain his actions to the satisfaction of the officer may be detained and further questioned and investigated.

(c) The total period of detention provided for by this section shall not exceed 2 hours. The detention is not an arrest and shall not be recorded as an arrest in any official record. At the end of the detention the person so detained shall be released or be arrested and charged with a crime.

**7.** *See supra* note 3.

**8.** The *McNabb-Mallory* rule was derived from *McNabb v. United States*, and *Mallory v. United States, supra.* Under this rule, any confession

or incriminatory statement obtained during an unlawful detention is inadmissible in evidence. Federal Criminal Rule 5(a), adopted after *McNabb*, requires that a defendant be brought before a magistrate without "unnecessary" delay. The Delaware Rule *refers to "unreasonable"* delay. Super.Ct.Crim.R. 5(a).

**9.** 11 *Del.C.* § 1911 was predecessor to 11 *Del.C.* § 1909.

The language used in § 1909 is identical to § 1911 and reads as follows:

§ 1909. Hearing without delay; permissible delay.

If not otherwise released, every person arrested shall be brought before a magistrate without unreasonable delay, and in any event he shall, if possible, be so brought within 24 hours of arrest, Sundays and holidays excluded, unless a resident judge of the county where he is detained or of the county where the crime was committed for good cause shown orders that he be held for a further period of not exceeding 48 hours.

though less than 24 hours in duration. But no clear-cut standards of reasonableness may be prescribed. Each case must be considered by the trial judge on its own facts; and the number of hours of detention prior to appearance before a Justice of the Peace is to be considered by the trial judge, together with all of the other circumstances of the case, in determining whether the delay was unreasonable. . . .

*Webster, supra* at 301. In *Webster*, the defendant had been held for approximately four hours before making a confession, and, after a "totality of the circumstances" review, this Court ruled that there had been no unreasonable delay in having the defendant brought before a Justice of the Peace.

More recently, in *Fullman v. State*, Del. Supr., 389 A.2d 1292 (1978), this Court ruled on the reasonableness of a 21 hour delay. Citing *Webster, supra*, the Court considered all the circumstances of the case and determined that, excluding the time the defendant had spent sleeping and undergoing polygraph testing administered at his request, the delay chargeable to the police was no more than six hours. Furthermore, "an atmosphere of cordiality and mutual trust permeated the proceedings." *Fullman*, 389 A.2d at 1298. The Court also noted that the interrogation took place on a Sunday, which is excluded from the 24 hour limit set forth in § 1909. Following this totality of the circumstances review, the majority of the Court ruled the delay reasonable, affirming the Superior Court's admission of Fullman's inculpatory statement.[10]

■ In the present case, the defendant made his first inculpatory statement after being detained approximately 20 hours. He was interrogated for about three hours

after he was brought into custody on February 7th. The defendant was then transported to the Bridgeville Police Station, where he spent the night. The following morning he was returned to Delaware State Police Troop 5, where he consented to a polygraph examination, after which he made his statement. There was no evidence that the police acted in a hostile or coercive manner, or that anything but "an atmosphere of cordiality" had existed during the interrogations. Excluding the polygraph testing, the police were chargeable with only three to four hours of interrogation time during the 20 hour period, with the defendant being given about 12 hours' rest. After reviewing these circumstances surrounding the detention, we cannot say that the Superior Court erred as a matter of law in finding the delay reasonable. Consequently, we affirm the trial court's decision to admit the defendant's first recorded statement.

Defendant asserts that his second taped statement was made under circumstances which violated his rights to counsel as guaranteed by the Sixth and Fourteenth Amendments.[11]

■ The Sixth Amendment of the Constitution of the United States provides that: "In all criminal prosecutions the accused shall . . . have the assistance of counsel for his defense." In the Supreme Court's analyses concerning the point at which a defendant's Sixth and Fourteenth Amendment rights to counsel attach, the Court has repeatedly stated, that, at a minimum, a defendant is entitled to legal representation "at or after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972); *Powell v. Alabama*, 287 U.S.

---

10. Duffy, J., filed a concurring opinion.

11. This claim was not presented to the trial court, which, therefore, never had an opportunity to rule on the Sixth Amendment claim or defendant's possible waiver thereof. Instead, at the suppression hearing and at trial, defendant claimed that the statement was made involun-

tarily, and, therefore, was inadmissible under the dictates of *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 99 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In view of our resolution of the Sixth Amendment issue, we need not and will not address the voluntariness claim.

45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); and *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Cf. Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). This principle applies whether proceedings are commenced by way of a formal charge, preliminary hearing, indictment, information, or arraignment. *Id.* The Supreme Court explained that it is at this initial stage of the criminal justice process, when the government has focused its efforts on a particular defendant and the prosecutorial forces have begun to operate against him, that the assistance of counsel is imperative. *Kirby v. Illinois, supra* 92 S.Ct. at 1882. Defendants are simply ill-equipped to handle the "critical" pretrial stages without the assistance of a trained representative who can address complex issues of substantive and procedural law. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). Unlike the right-to-counsel situation discussed in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and other Fifth Amendment cases, the defendant's Sixth Amendment right to counsel is not dependent upon the defendant's request for such counsel. *Carnley v. Cochran,* 369 U.S. 506, 513, 82 S.Ct. 884, 888, 8 L.Ed.2d 70 (1962). Instead, the latter right is activated by the initial judicial adversary proceeding and applies to *any* statements made by defendant, even if unsolicited. *McLeod v. Ohio,* 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682 (1965) (*per curiam*).

■ In this Court's decision in *Flamer v. State,* Del.Supr., 490 A.2d 104, 114 (1984), we assumed that the defendant's initial appearance in the Justice of the Peace Court qualified as the initiation of the adversary process. Similarly, in this case, since Deputy was arrested, appeared before a magis-

trate in the Justice of the Peace Court, and was ordered committed to a correctional facility prior to issuing his second statement, we assume that the adversary process began when he went before the magistrate. *See Brewer v. Williams, supra* 97 S.Ct. at 1239. Since the adversarial judicial process certainly was underway, defendant was entitled to legal assistance at the time he made his second confession.

Defendant's right to an attorney before being further questioned was demonstrated by Detective Chaffinch's testimony at trial, where he candidly admitted violating the Justice of the Peace Court's commitment order by continuing to detain defendant at the police troop for an additional nine hours for the express purpose of eliciting an incriminating statement. Detective Chaffinch testified that defendant would have remained at the police troop until he told the detective the "truth". This recitation of the detective's intention certainly supports the notion that defendant had arrived at a critical stage of his pretrial proceedings where his right to representation was crucial.

■ The inquiry which necessarily follows is whether the defendant indicated a desire to waive his right to counsel. The waiver of such a right, like the waiver of other constitutionally protected fundamental rights, is stringently reviewed by the courts. *See Miranda, supra* 86 S.Ct. at 1628; *Schneckloth, supra* 99 S.Ct. at 2055, and *Brewer, supra* 97 S.Ct. at 1242. In such situations it is the State's burden to prove "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst, supra* 58 S.Ct. at 1023. The courts have acknowledged the state's burden to be a "heavy" one and will indulge in all reasonable presumptions against a finding of waiver. *Miranda, supra* 86 S.Ct. at 1628; *Brewer, supra* 97 S.Ct. at 1241, 1242, and *Brookhart v. Janis,* 384 U.S. 1, 86 S.Ct. 1245, 1246 16 L.Ed.2d 314 (1966).[12]

---

12. Generally it is for the trial court to determine whether there has been a waiver but because the Sixth Amendment issue was not raised at trial, the court did not have the opportunity to make such a ruling. *Johnson v. Zerbst, supra* 58 S.Ct. at 1023.

Our reading of the waiver standards suggests that the State must show: (1) that the defendant comprehended the nature of the right which he was forfeiting; (2) that defendant either by his own words or conduct, indicated an affirmative desire to relinquish these rights; (3) and that he did so voluntarily.

▇▇▇ A careful review of the State's brief and the record below has failed to convince this Court that the State has met its burden of proof. The record is void of any evidence which suggests that defendant had a real understanding of his right to counsel or of the possible consequences of a failure to secure legal assistance. Furthermore, we remain unconvinced that the defendant relinquished this right. While it was true that the defendant was read his *Miranda* rights on four separate occasions prior to his second confession, he never responded to such inquiries, but, instead, continued to passively answer the questions of the police. Mere responses to police initiated interrogations are not sufficient to show a valid waiver.[13] *See Edwards v. Arizona, supra* at 1885; *see also McLeod v. Ohio, supra; Massiah v. U.S., supra.*

▇▇▇ Indeed, according to the Supreme Court's analyses in Fifth Amendment cases, once the accused has requested the presence of counsel during interrogations, such interrogations must cease until counsel is present or until the accused himself has initiated further communication or conversation with the police. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); *see also Miranda, supra* 86 S.Ct. at 1627. In the Sixth Amendment context, once the adversarial judicial process has begun, defendant is entitled to the presence of counsel during police interrogations as a matter of inherent right. Therefore, the only means by which waiver could be established, and still remain consistent with the Fifth Amendment waiver analysis, would involve some form of affirmative overt action by the defendant which indicated his willingness to talk to law enforcement officers.[14]

On the issue of waiver we consider the facts here to be distinguishable from those in *Flamer. See Flamer v. State,* 490 A.2d at 113–115.[15] Thus, on the basis of this

---

13. The State suggests that defendant's failure to request an attorney after being given his *Miranda* rights should be sufficient indicia of an "intentional relinquishment" of defendant's right to counsel and thereby invoke waiver. We disagree. The Supreme Court has stated that the presence of counsel at critical pretrial stages is often as important, if not more so, than the presence of counsel at trial. *Powell, supra* 53 S.Ct. at 59, 60; *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 1202, 12 L.Ed.2d 246 (1964); *U.S. v. Wade, supra* 87 S.Ct. at 1930. Therefore, it seems incongruous for trial judges to go to such great lengths in assuring themselves that the right to counsel is knowingly and intelligently waived when a defendant decides to forsake legal representation and proceed *pro se* at trial, while treating the forfeiture of the same right in a less cautious manner when administered by an adverse law enforcement officer at pretrial. *See Von Moltke v. Gillies,* 332 U.S. 708, 721–724, 68 S.Ct. 316, 322–3, 92 L.Ed. 309 (1948) (for a discussion of the trial judge's responsibilities in deciding accused's ability to waive the Sixth Amendment right to counsel at trial); *see also U.S. v. Satterfield,* 417 F.Supp. 293, 296 (S.D.N.Y.1976) and *United States ex rel. Lopez v. Zelker,* 344 F.Supp 1050, 1054 (S.D.N.Y.1972), *aff'd* 465 F.2d 1405 (2d Cir.1972), *cert. denied* 409 U.S. 1049, 93 S.Ct. 529, 34 L.Ed.2d 501 (1972) (where the courts first expressed doubt that the *Massiah* right to counsel could ever be waived and then determined that if it could, the applicable standard would be the same one imposed on *pro se* defendants at trial).

14. Authorities have noted that waiver of a Sixth Amendment right to counsel is, if anything, a more difficult standard to satisfy than the Fifth Amendment right to counsel waiver.

*U.S. v. Satterfield,* 417 F.Supp. 293 (S.D.N.Y. 1976); *U.S. v. Massimo,* 432 F.2d 324, 327 (2d Cir.1970) *cert. denied,* 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 633 (1971) (Friendly, J. dissenting).

15. One circumstance which precludes our finding of a waiver in this case, as opposed to *Flamer,* is that Flamer was presented to the Justice of the Peace Court in the morning, the day after his arrest.

On the other hand, Deputy was brought to Police Troop 5 that same morning. He then voluntarily submitted to a polygraph test. When informed that he had failed the polygraph, defendant offered his first taped statement. At about mid-afternoon, he made his initial appearance in the Justice of the Peace

record, we cannot find that the State satisfied its heavy burden of overcoming the presumption against waiver.

We, therefore, rule that the second taped confession of defendant was improperly admitted in violation of defendant's Sixth Amendment right to counsel. However, our decision in this matter does not mandate complete reversal under the facts of this case. Despite the fact that the defendant's second confession was erroneously admitted into evidence, we conclude that the error was harmless beyond a reasonable doubt as to the felony murder convictions. *See Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (where the harmless error rule was applied to a violation of petitioner's Sixth Amendment right to counsel); *see also United States ex rel. Ahmad v. Redman*, 599 F.Supp. 802 (D.Del.1984) (where the harmless error rule applied to a violation of petitioner's Fifth Amendment rights under *Miranda*).

However, we cannot say that the error was harmless as to the two intentional murder convictions.

By his own admission, defendant argues that the second statement added nothing which was inconsistent with his first statement, except the fact that he had stabbed Mrs. Smith.

■ Under all the circumstances, we can confidently state that the second statement did not contribute to the jury's guilty verdict as to robbery. Since two murders took place during the commission of the robbery (in which the jury decided that defendant had participated), the elements of felony murder are clearly established. *Martin v. State*, Del.Supr., 433 A.2d 1025, 1029 (1981); *Hooks v. State*, Del.Supr., 416 A.2d 189, 197 (1980). *See also Whalen v.*

*State*, Del.Supr., 492 A.2d 552, 563–565 (1985). No matter how the evidence was viewed by the jury, a finding of guilt was mandated on the felony murder counts. For these reasons we hold that the admission of the second statement was harmless, beyond a reasonable doubt, as to the felony murder convictions. The intentional murder convictions are hereby reversed.

### B.

Defendant contends the trial court erred in admitting into evidence, over defendant's objection, nine autopsy photographs of the victims, and two photographs of the victims taken at the scene of the homicide. It is defendant's contention that Rule 403 of the Delaware Rules of Evidence requires the exclusion of these photographs.[16] Defendant claims the prejudicial effect of the photographs outweighed their probative value, and, in light of other evidence presented, such evidence was merely cumulative. As this Court recently said in *Bailey v. State*, Del.Supr., 490 A.2d 158, 167 (1984): "The Trial Judge has broad discretion in admitting or rejecting photographic evidence of the victims and scenes of murders."

■ None of the photographs was in color, but the probative value of these pictures of the victims taken at the scene is clear and they are relevant to substantiate the robbery motive. The autopsy photographs illustrate the multiple wounds from two different knives, including "defense type" wounds, and these are relevant to show intent and the participation of more than one assailant in the commission of the murders. Under these circumstances we cannot say the admission into evidence of these photographs was an abuse of discretion by the trial judge.

Court and was ordered committed to the Sussex County Correctional facility. However, Detective Chaffinch ignored this commitment order and detained Deputy at the police troop for an additional eight hours before the confession in question was finally elicited.

**16.** D.R.E. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.

■ Deputy also contends that the trial court abused its discretion in requiring him to show in advance that the testimony of certain police officers he proposed to call as defense witnesses would not be cumulative. Deputy contends that such ruling was premature and prejudicial in that it required him to reveal his entire defense prior to the calling of his first witness. There is no merit in these contentions.

D.R.E. 403 permits the trial judge to exclude cumulative evidence. D.R.E. 403 (footnote 16, *supra*).

The police officers Deputy sought to call had all testified during the State's case-in-chief. All had been subject to cross-examination. Therefore, it seemed probable that their testimony as defense witnesses would be merely cumulative. In the exercise of discretion, the trial judge ruled that he would exclude such testimony, absent any indication that it would not be cumulative. Deputy made no such showing. At the close of the defense case, the trial court gave the defendant another opportunity to show that the testimony of the police officers would not be cumulative. Defense counsel declined.[17]

We find no abuse of discretion here in requiring the offer of proof. There was a likelihood that the testimony was cumula-tive. Deputy made no showing to the contrary. Moreover, on this appeal, Deputy has not demonstrated any prejudice which resulted from the actions of the trial court. *Johnson v. State*, Del.Supr., 379 A.2d 1129 (1977).

### C.

Deputy contends that there was insufficient evidence to support his convictions of robbery in the first degree, 11 *Del.C.* § 832(a) [18] and two counts of felony murder (murder in the first degree with robbery as the underlying felony), 11 *Del.C.* § 636(a)(2).[19]

Deputy argues that the record contains no evidence of theft, a necessary element for both the offense of first degree robbery and the offense of felony murder. We disagree.

■ The record contains ample evidence of theft. Deputy admitted having accompanied Flamer to the Smith residence for the purpose of obtaining money from the elderly couple. In addition, when Deputy was arrested, the police found him in possession of Byard Smith's wallet and watch.

Deputy also claims that there is no evidence showing that the murders occurred in the "course of committing the theft."

---

17. Presumably after making a sufficient showing, the trial court permitted Deputy to recall the Harrington Police Chief. In addition, during rebuttal, the State called three of the four police officers Deputy sought to call. Again, all were cross-examined.

18. 11 *Del.C.* § 832(a) provides:

(a) A person is guilty of robbery in the first degree when he commits the crime of robbery in the second degree and when, in the course of commission of the crime or of immediate flight therefrom, he or another participant in the crime:

(1) Causes physical injury to any person who is not a participant in the crime; or

(2) Displays what appears to be a deadly weapon; or

(3) Is armed with and uses or threatens the use of a dangerous instrument.

\* \* \* \* \* \*

11 *Del.C.* § 831 defines "robbery in the second degree" as follows:

A person is guilty of robbery in the second degree when, in the course of committing theft, he uses or threatens the immediate use of force upon another person with intent to:

(1) Prevent or overcome resistance to the taking of the property or to the retention thereof immediately after the taking; or

(2) Compel the owner of the property or another person to deliver up the property or to engage in other conduct which aids in the commission of the theft.

\* \* \* \* \* \*

19. 11 *Del.C.* § 636(a)(2) provides:

(a) A person is guilty of murder in the first degree when:

\* \* \* \* \* \*

(2) In the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom, he recklessly causes the death of another person . . . .

In support of this claim, Deputy contends that the record contains no evidence that he and Flamer intended to commit the theft prior to the murder. There is no merit in this contention.

■ In order to support a felony murder conviction, the law does not require that the theft necessarily precede the murder. It is enough that the murder facilitate the theft. *See Winborne v. State*, Del. Supr., 455 A.2d 357, 359 (1982), where we considered this question and held:

> A person is guilty of robbery when "in the course of committing a theft, he uses ... force upon another person with the intent to (1) prevent or overcome resistance to the taking of property or to the retention thereof immediately after the taking." 11 *Del.C.* § 831(1). While the phrase, "in the course of committing a theft," requires "a casual connection between the use or threat of force and the theft," Delaware Criminal Code with Commentary § 831 at 258 (1973), the code provision does not require that the application of force be contemporaneous with the actual appropriation of the property. It is sufficient to facilitate the commission of the taking or the retention of the property after it has been appropriated.

### D.

The American Civil Liberties Union of Delaware, Inc. (hereinafter "Amicus Curiae"), in a brief filed as Amicus Curiae, contends that the combined record from the suppression hearing and the subsequent trial is inadequate for review because it contains 119 unrecorded side bar conferences. The State disputes the significance of this figure, noting that:

(1) Forty-three conferences took place between Deputy and his attorney.

(2) Deputy's counsel requested 16 conferences without an accompanying request that such conferences be recorded. Nonetheless, the trial judge *sua sponte* requested that one of these conversations be recorded.

(3) The trial judge requested 44 conferences. Of these, two were recorded at the Court's request; five involved only scheduling matters.

(4) The State requested five side bar conferences; the bailiff, one.

At no time, did Deputy request that any of these conferences be recorded.

■ Deputy's failure to object to the absence of a court reporter is fatal to Amicus Curiae's contention. As we noted in *Flamer*, "Defense counsel has primary responsibility for seeing to it that a complete record, including side bar conferences, is made for appellate review." *Flamer v. State, supra* at 131. *See State v. Rosenfeld*, Wis.Supr., 93 Wis.2d 325, 286 N.W.2d 596 (1980).

■ Moreover, Amicus Curiae has failed to show prejudice to Deputy as a result of the unrecorded side bar conferences. At the time of the trial in this case, in Delaware the question of recording such side bar discussions rested within the discretion of the trial judge.[20] Thus, where the defendant failed to timely object, there is no basis upon which to find reversible

---

**20.** 10 *Del.C.* § 525 provides, in pertinent part: The duties of the Court Reporters shall be ... to report all evidence, opinions and other matters as the Superior Court may require and to perform such other duties as the Superior Court may prescribe.

\* \* \* \* \* \*

The current rule in Delaware requires that side bar conferences must be recorded, "unless the trial judge determines, in advance, that neither evidentiary nor substantive issues are involved." *Whalen v. State*, Del.Supr., 492 A.2d 552, 558 (1985).

In contrast, under the federal statute, the recording of "all proceedings in criminal cases had in open court" is mandatory. 28 *U.S.C.* § 753(b)(1). Despite the mandatory nature of reporting, the failure to report side bar conferences even in death penalty cases does not amount to reversible error, absent a showing of prejudice. *See Stephens v. Zant*, 5th Cir., 631 F.2d 397 (1980), *rev'd on other grounds*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

error, absent a showing of prejudice. *Flamer v. State, supra* at 131; *see State v. Bolling*, W.Va.Supr., 162 W.Va. 103, 246 S.E.2d 631 (1978) (showing of prejudice required even where reporting of all proceedings is mandatory). In this case, Amicus Curiae concedes that "there is presently nothing to suggest that anything improper did occur during the 119 unrecorded side bar or off the record discussions." As no harm to the defendant has been shown, no basis exists upon which to find error.

### E.

Both the defendant and Amicus Curiae argue that it constitutes reversible error to have convicted the defendant on four counts of murder in the first degree when there were, in fact, only two victims.

The defendant was charged and convicted on two counts of intentional murder under 11 *Del.C.* § 636(a)(1), which provides:

(a) A person is guilty of murder in the first degree when:

(1) He *intentionally* causes the death of another person. (Emphasis added.)

The Delaware Code, 11 *Del.C.* § 231(a)(1) defines "intentionally as follows:

(a) *"Intentionally"*.—A person acts intentionally with respect to an element of an offense when:

(1) If the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause that result.

And, the defendant was charged and convicted on two counts of felony murder under 11 *Del.C.* § 636(a)(2), which provides:

(a) A person is guilty of murder in the first degree when:

\* \* \* \* \* \*

(2) In the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom, he *recklessly* causes the death of another person. (Emphasis added.)

The statute defines "recklessly," in pertinent part as follows:

(c) *"Recklessly"*.—A person acts recklessly with respect to an element of an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from his conduct. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct a reasonable person would observe in the situation.

11 *Del.C.* § 231(c).

While the defendant concedes that the State may charge on both offenses, he argues that convictions on both offenses cannot stand as a violation of 11 *Del.C.* § 206(a)(3), which prohibits convicting a person of more than one offense where "[i]nconsistent findings of fact are required to establish the commission of the offenses." The defendant argues that he could not have acted both "intentionally" and "recklessly" at the same time with respect to both victims. Therefore, he argues, the two charges contradict one another and, ultimately, he could have been convicted of either intentional murder or felony murder, but not both.

We considered this very issue in *Rush v. State*, Del.Supr., 491 A.2d 439 (1985). There, we stated:

There is no inconsistency in charging the defendant under both theories of first degree murder or in the jury's verdicts. The evidence presented supported both murder theories. A factual finding that a defendant acted intentionally may also include a finding of recklessness under 11 *Del.C.* § 253, which states in pertinent part:

When a statute provides that criminal negligence suffices to establish an element of an offense, the element also is established if a person acts intentionally, knowingly or recklessly. When recklessness suffices to establish an element of an offense, *the element also is established if a person acts intentionally or knowingly.* When acting knowingly suffices to establish

an element of an offense, the element also is established if a person acts intentionally. (Emphasis added.)

*Rush*, 491 A.2d at 444. *Cf. Flamer v. State, supra* at 117–118.

Though we find no merit in the defendant's contention, we note that our reversals of the defendant's convictions for intentional murder render this issue moot.

\* \* \*

**F.**

Amicus Curiae also contends that the trial judge committed plain error[21] in instructing the jury that it could convict the defendant of first degree murder if it found that "[t]he defendant acted intentionally or recklessly."

Jury instructions need not be perfect. *Whalen v. State*, Del.Supr., 492 A.2d 552, 559 (1985); *Haas v. United Technologies Corp.*, Del.Supr., 450 A.2d 1173, 1179 (1982). "[J]ury instructions are adequate if they are such as to 'enable the jury to intelligently perform its duty in returning a verdict.'" *Storey v. Castner*, Del.Supr., 314 A.2d 187, 194 (1973)." *Whalen v. State, supra* at 559. Moreover, in assessing the adequacy of an instruction, we must examine the entire instruction and not merely one statement taken out of context. *Haas v. United Technologies, supra* at 1179.

In this case, immediately prior to the instruction under review, the trial judge read the felony murder statute, 11 *Del.C.* § 636(a)(2), to the jury, making it clear that a person possessing a "reckless" state of mind can only be convicted of first degree murder if he recklessly kills while committing a felony. Moreover, immediately after the instruction under review, the trial judge again advised the jury that "[the] killing must have occurred during the commission of another felony. In this case, that felony would be robbery...."

Considering the jury instruction in its entirety, we find nothing sufficiently misleading so as to have prevented the jury from "intelligently perform[ing] its duty in returning a verdict." *Storey v. Castner, supra* at 194. The charge objected to was not misleading when read as a whole, and the portion objected to did not amount to reversible error.

**G.**

For the first time on appeal, the defendant challenges the jury instruction given by the trial court pursuant to 11 *Del.C.* § 307(a).[22]

The defendant contends that the instruction violates his Fourteenth Amendment rights of due process. First, he argues that, by permitting the jury to infer the

---

21. Because the defendant did not object to the jury instruction at trial, the only basis upon which this Court can reverse is plain error. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

22. 11 *Del.C.* § 307(a) provides:

(a) The defendant's intention, recklessness, knowledge or belief at the time of the offense for which he is charged may be inferred by the jury from the circumstances surrounding the act he is alleged to have done. In making the inference permitted by this section, the jury may consider whether a reasonable man in the defendant's circumstances at the time of the offense would have had or lacked the requisite intention, recklessness, knowledge or belief.

The pertinent portion of the instruction reads as follows:

I have instructed you that an element of the offenses of murder in the first degree and

robbery in the first degree is that the defendant acted intentionally and/or recklessly. It is, of course, difficult to know what is going on in another person's mind. Therefore, our law permits the jury to draw an inference, or in other words, to reach a conclusion, about the defendant's state of mind from the facts and circumstances surrounding the act the defendant is alleged to have done. In reaching this conclusion, you may consider whether a reasonable man in the defendant's circumstances would have had or lacked the requisite intention and/or recklessness. You should, however, keep in mind at all times that it is the defendant's state of mind which is at issue here, and in order to convict the defendant you are required to find beyond a reasonable doubt that he in fact had the intention and/or recklessness required for guilt.

existence of an element (i.e., his state of mind) from proof of the surrounding circumstances, the instruction relieved the State of its burden of proving every element of the offense beyond a reasonable doubt. *See Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Further, the defendant argues that the instruction impermissibly shifted the burden of proof to him "inasmuch as the jury was not advised that any permissible inference did not relieve the State of its burden of proving guilt beyond a reasonable doubt." *See Francis v. Franklin,* — U.S. —, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

■ The defendant concedes that the inference contained in the instruction at issue here is a permissive inference. Such an inference permits, but does not require, the trier of fact to infer the existence of an element of the offense from the existence of the facts in evidence; and, it places no burden on the defendant. *Francis v. Franklin, supra* 105 S.Ct. at 1971; *Ulster County Court v. Allen,* 442 U.S. 140, 157, 99 S.Ct. 2213, 2224, 60 L.Ed.2d 777 (1979).

■ In *Francis v. Franklin, supra* 105 S.Ct. at 1971, the United States Supreme Court commented on the constitutionality of permissive inferences:

A permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proven. Such inferences do not necessarily implicate the concerns of *Sandstrom.* A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury. *Ulster County Court [v. Allen], supra,* 442 U.S. at 157–163, 99 S.Ct. at 2224–2227.

Deputy has failed to show that, in light of the proven facts, reason and common sense do not justify the inferred element of intent

suggested by the permissive inference. Therefore, he has not demonstrated a violation of his right to due process under the Fourteenth Amendment.

Although *Sandstrom v. Montana, supra,* involved a conclusive presumption, the defendant relies on dicta from that case in support of his argument. In *Sandstrom,* the Court noted that, if "[a] presumption which, although not conclusive, had the effect of shifting the burden of persuasion to the defendant, [it] would have suffered from similar [constitutional] infirmities." 99 S.Ct. at 2459. *See Francis v. Franklin, supra* 105 S.Ct. at 1972–1973.

■ The instruction in question here did not shift the burden of persuasion to the defendant, requiring him to disprove an intentional state of mind. The instruction clearly told the jury that: (1) it had to find that the defendant had the requisite intent; (2) it could, but was not required, to infer the existence of the requisite intent from the evidence surrounding the killings; and (3) even given the inference, it "had to keep in mind at all times that it is the defendant's state of mind which is at issue here, and in order to convict the defendant you are required to find beyond a reasonable doubt that he in fact had the intent and/or recklessness required for guilt." As the instruction explained the State's burden, there was no constitutional infirmity therein.

Finally, we note that the problems involved in proving the existence of a person's state of mind necessitate some reliance on circumstantial evidence. In *Plass v. State,* Del.Supr., 457 A.2d 362, 365 (1983), we said:

As a matter of common sense, in judging the sufficiency of the evidence as to the state of mind, the jury must be able to weigh the conduct of the defendant. Otherwise, in most situations, the only evidence would be the defendant's own self-interested testimony.

*See also* Commentary to 11 *Del.C.* § 307.

As Deputy has failed to either make the requisite showing under *Francis v. Franklin, supra,* and *County Court of Ulster v.*

*Allen, supra,* or to demonstrate a shift in the burden of proof, his challenge to the quoted portion of the trial court's jury instructions is deemed to be without merit.

## PENALTY PHASE

### I.

Having concluded our review of the guilt phase of this case we now turn our attention to the death penalty phase which was tried before the same trial judge and jury on February 12, 1982. At the outset, the jury was briefly instructed pursuant to 11 *Del.C.* § 4209 [23] as to their function at the penalty stage of the proceedings:

> Members of the jury panel, our criminal code of this State states upon the conviction of guilt of the defendant upon first degree murder that the Superior Court shall conduct a separate hearing to determine whether the defendant will be sentenced to death or life without probation or parole.

The prosecuting attorney, informed the jury that the State was seeking the death penalty and that it was the jury's function to determine whether the defendant should be sentenced to death or life imprisonment without probation or parole. The jury was also told that in determining the sentence to be imposed they must weigh aggravating and mitigating circumstances and that the State was relying on the following three statutory circumstances in seeking the death penalty:

> (a) The murders were committed while the defendant was engaged in the commission of robbery.
>
> (b) The defendant's course of conduct resulted in the deaths of 2 or more persons where the deaths were a probable consequence of the defendant's conduct.
>
> (c) The murders were committed for pecuniary gain.

*See* 11 *Del.C.* § 4209(e)(1) and (2). The prosecuting attorney further informed the jury that their previous finding that the defendant was guilty of two counts of felony murder, established, pursuant to 11

*Del.C.* § 4209(e)(2), the first statutory aggravating circumstance beyond a reasonable doubt. The prosecutor stated that the State would rely upon the trial testimony for proof of the other two statutory circumstances. No new testimony was offered by the State at the penalty hearing. The State rested after introducing records of defendant's previous convictions for manufacturing a Molotov cocktail, sexual assault, and manslaughter.

The defense then introduced, as mitigating factors, a Social Service case summary, which included psychiatric and psychological examinations relating to defendant's hospitalization at Governor Bacon Health Center, a psychological report of July 11, 1979 by Cono Galliani, Ph.D., of the Delaware State Hospital staff, and a psychiatric report of June 6, 1979, by Robert W. Buckley, M.D., Medical Director of the Delaware State Hospital. The defense also presented the testimony of three ministers and a Bible Study instructor who had worked with and observed the defendant during his incarceration. Finally, the defendant testified, expressing reverence and describing his change of lifestyle.

Following the summations by counsel, the jury was instructed by the court as to the jury's obligations and the findings that it was required to make in determining the sentence to be imposed upon the defendant. The jury then retired for deliverations which culminated in four unanimous verdicts of death—two for intentional murder and two for felony murder.

The defendant asserts several grounds of appeal arising from the penalty phase of his trial. We will address these contentions only as they apply to the defendant's convictions of felony murder, since we have held that the defendant's convictions for intentional murder must be reversed.

### II.

### A.

The defendant initially contends that the imposition of the death penalty in this case

---

**23.** For a detailed discussion of § 4209 see *Flam-* er, 490 A.2d at 121–23.

is barred by the Eighth and Fourteenth Amendments of the United States Constitution as a cruel and unusual punishment because the basis of the convictions of intentional murder and felony murder may have been predicated upon an accomplice liability theory. In instructing the jury regarding its determination of the defendant's guilt, the trial judge stated:

In this case, the defendant is charged with offenses, the elements of which, according to the State's contention, may actually have been performed by another person, William Henry Flamer. You may find the defendant guilty of the offenses in this case if you are satisfied beyond a reasonable doubt that:

(a) The other person performed all of the elements of the offenses charged as I have defined them for you.

(b) The defendant intended, that is, it was his conscious object or purpose to promote or facilitate the commission of the offenses.

(c) The defendant aided, counseled, agreed or attempted to aid the other person in committing the offense.

The defendant contends that the jury may have relied on the above instruction and his assertion at trial that he did not participate in the stabbing of either victim, and concluded, based solely on an accomplice liability theory, that the defendant was guilty on all four murder counts. The defendant contends that the United States Supreme Court's opinion in *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), prohibits, as unconstitutional, the imposition of the death penalty upon a defendant found guilty only under an accomplice liability theory.

We do not read *Enmund* as prohibiting the imposition of the death penalty in this case. *Whalen v. State*, Del.Supr., 492 A.2d at 563–565. The defendant in *Enmund* was convicted of first degree murder and sentenced to die for his role as an accomplice to a felony, during the course of which a death occurred. Enmund had waited in a getaway car while his two accomplices committed a robbery and two murders which apparently were not contemplated when the robbery was planned.

The key element of the *Enmund* analysis is that Enmund played no role in the killings. The United States Supreme Court stated:

[I]t is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty on one such as Enmund who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed. We have concluded, that it does not.

*Enmund, supra* 102 S.Ct. at 3376.

Unlike Enmund, Deputy was admittedly present at the killings, and, at the very least, did nothing to stop them. There were 145 wounds inflicted upon the two victims, two weapons were used in the murders, and Deputy had one of the victims' watch and wallet the morning after the killings. These factors indicate that Deputy was not solely a participant in the underlying felony, but was instead present during, and involved in, the actual murders. In *Whalen v. State*, 492 A.2d at 565, we held that:

... [T]he death penalty is not a grossly disproportionate and excessive punishment for a defendant found guilty of felony murder, who actually killed his victim under the circumstances present here. We note that such a conclusion comports with the requirement that a defendant's punishment 'be tailored to his personal responsibility and moral guilt.' *Enmund*, 458 U.S. at 801, 102 S.Ct. at 3378.

The Florida Supreme Court in *Hall v. State*, Fla.Supr., 420 So.2d 872 (1982) faced with a claim similar to Deputy's stated:

Hall claims that the death penalty cannot be imposed because he did not actually and intentionally kill the victim. In *Enmund* the Supreme Court held that Florida's death penalty statute cannot be ap-

plied to one who did not kill, attempt to kill, intend to kill, or intend that lethal force be used. We agree with the trial court that *Enmund* is distinguishable from the instant case. Hall provided the weapon used to kill Mrs. Hurst and was present at her death. Additionally, *Enmund* was an aider and abettor only to the underlying felony. Hall, on the other hand, was an aider and abettor to the homicide as well as the underlying felony.

*Hall v. State, supra* at 874.

■ Thus, we conclude that *Enmund* does not preclude the imposition of the death penalty in this case where Deputy was not "found guilty only vicariously as a felony murderer." *Whalen,* 492 A.2d at 563. *See Riley v. State,* Del.Supr., 496 A.2d 997 (1985).

### B.

■ The defendant also contends that it was plain error to permit the imposition of the death penalty when the State did not offer evidence to prove the existence of the statutory aggravating circumstances at the penalty hearing. However, this Court has held in *Flamer* that "[c]lose scrutiny of our statute discloses no language which prohibits the sentencing jury below from considering in the penalty phase evidence which it heard already at the liability phase." *Flamer,* 490 A.2d at 125. Thus, the jury properly considered evidence that had been presented in both phases of trial in concluding that three statutory aggravating circumstances existed.

### C.

■ The defendant also asserts that the trial court erred in instructing the jury that the defendant's conviction of felony murder pursuant to 11 *Del.C.* § 636(a)(2) established the existence of a statutory aggravating circumstance necessary to impose the death penalty. Defendant contends that the instruction constituted an impermissible conclusive presumption. This argument was rejected in *Flamer. Flamer,*

490 A.2d at 127. The defendant's conviction of felony murder clearly established a statutory aggravating circumstance as described in 11 *Del.C.* § 4209(e)(2). As we stated in *Flamer,* it is "not necessary for the State to prove this fact a second time at the penalty hearing." *Flamer,* 490 A.2d at 127. *See also Whalen v. State,* 492 A.2d at 565, 566.

### D.

■ The defendant also contends, for the first time in this appeal, that the jury should not have been permitted to consider as statutory aggravating circumstances, both that the murder was committed during the commission of a robbery, 11 *Del.C.* § 4209(e)(1)(j) and (e)(2), and that the murder was for pecuniary gain. 11 *Del.C.* § 4209(e)(1)(*o*). The language of 11 *Del.C.* § 4209(e)(2) clearly anticipates that duplicative statutory aggravating circumstances may be considered by the jury. That section provides:

In any case where the defendant has been convicted of murder in the first degree in violation of any provision of § 636(a)(2)–(7) of this title, that conviction shall establish the existence of a statutory aggravating circumstance and the jury, or judge where appropriate, shall be so instructed. *This provision shall not preclude the jury, or judge where applicable, from considering and finding the statutory aggravating circumstances listed in this subsection and any other aggravating circumstances established by the evidence.*

11 *Del.C.* § 4209(e)(2) (emphasis added).

Further, in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the statutory aggravating circumstances relied on by the jury that sentenced Gregg were both that the murder was committed during the commission of a robbery and that the murder was committed for pecuniary gain. The United States Supreme Court affirmed Gregg's death sentence holding that "the statutory system under

which *Gregg* was sentenced to death does not violate the Constitution." *Gregg, supra* at 2941.

Finally, we specifically recognized in *Flamer* that such allegedly duplicative statutory aggravating circumstances do not prejudice the defendant in a case such as this where other aggravating and mitigating factors have been presented to the jury. *Flamer*, 490 A.2d at 125. *See Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983).

### E.

Amicus Curiae contends that Delaware's statutory scheme for the consideration of unspecified aggravating and mitigating circumstances is unconstitutional. Specifically, Amicus Curiae reasons that the jury might have considered, as an additional aggravating circumstance, that the victims were "elderly". Such consideration allegedly would be unconstitutional, since this Court has stated that the fact that the victim was elderly is unconstitutionally vague as a *statutory aggravating circumstance*. *State v. White*, Del.Supr., 395 A.2d 1082, 1090 (1978).

However, our death penalty statute makes it clear that the jury is to consider other characteristics of the crime and the defendant in determining the appropriate sentence. 11 *Del.C.* § 4209(d)(1)(b). Further, the United States Supreme Court has recognized that:

[S]tatutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime.

*Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235 (1983) (citations omitted). Thus, the jurors were correctly permitted to consider any factors that they determined were relevant to the sentencing stage, even if such factor had been deemed to be too vague to be used as a statutory aggravating circumstance.

### F.

The defendant's contention that the trial court's jury instructions were inadequate is also without merit. The instruction adequately conveyed to the jury the legal principle that jurors retained the option to recommend life imprisonment despite any aggravating factors found to exist. *See Flamer*, 490 A.2d at 127–28. *Compare Whalen*, 492 A.2d at 559–62.

### G.

Finally, we turn to our statutory obligation to review the imposition of the death penalty in this case. Section 4209(g)(2) provides:

The Supreme Court shall limit its review under this section to the recommendation on and imposition of the penalty of death and shall determine:

a. Whether, considering the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended or disproportionate to the penalty recommended or imposed in similar cases arising under this section.

b. Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection (e) of this section and, where applicable, § 636(a)(2)–(7) of this title.

Turning first to subparagraph b, we conclude that the evidence supported the jury's findings of the statutory aggra-

vating circumstances which have been discussed in this opinion. Specifically, the jury found the defendant guilty of two counts of felony murder pursuant to 11 *Del.C.* § 636(a)(2). Thus, the jury's reliance on the statutory aggravating circumstance "that the murder occurred during the commission of the felony of robbery" was necessarily appropriate. There is also sufficient evidence to support the jury's conclusions that the defendant's conduct resulted in two deaths, 11 *Del.C.* § 4209(e)(1)(k), and that the murders were committed for pecuniary gain. 11 *Del.C.* § 4209(e)(1)(*o*).

■ Two additional inquiries are posed under subparagraph a of section 4209(g)(2). Initially, we conclude that given "the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender" the sentence of death imposed by the jury was neither arbitrarily nor capriciously imposed. *See* 11 *Del.C.* § 4209(g)(2)a.

■ We have made the appropriate proportionality review and find, after careful consideration, that the imposition of the death penalty on Deputy was not disproportionate to the penalty recommended or imposed in those other first degree murder cases that have arisen under our statute and in which a statutory aggravating circumstance was found by the jury. 11 *Del.C.* § 4209(g)(2)a. *See Riley v. State,* Del.Supr., 496 A.2d 997, 1026 (1985); *Flamer,* 490 A.2d at 139–40.

Deputy, like the other defendants in Delaware who have been sentenced to the death penalty under 11 *Del.C.* § 4209, was found guilty of "an unprovoked, cold-blooded murder of [two] helpless [persons] committed upon victims lacking the ability to defend themselves and solely for pecuniary gain...." [24] *Riley,* 496 A.2d at 1027.

We find that the imposition of death in this case was therefore not disproportionate and the defendant's convictions and sentence as to the felony murder charges are accordingly affirmed.

\* \* \*

**AFFIRMED IN PART, REVERSED IN PART.**

McNEILLY, Justice (concurring in part and dissenting in part.)

Andre Stanley Deputy was found guilty by a Superior Court jury of two counts of intentional Murder in the First Degree, two counts of Felony Murder, one count of Robbery in the First Degree and one count of Possession of a Deadly Weapon During the Commission of a Felony. Deputy was sentenced to death on each of the four murder convictions and thirty year terms on the robbery and weapon convictions. The majority has ruled that the late evening taped confession of the defendant was improperly admitted into evidence in violation of his right to counsel as guaranteed by the Sixth and Fourteenth Amendments. As a consequence the majority reversed the intentional murder convictions but affirmed the felony murder convictions and the underlying crimes of Robbery in the First Degree and Possession of a Deadly Weapon During the Commission of a Felony and also affirmed the sentences imposed thereon. I concur in the affirmances but disagree that the 10 p.m. statement was improperly admitted into evidence, and that consequently the intentional murder convictions should be reversed.

There is no issue raised in this appeal of abusive tactics by the police during the interrogation and custody although I am mindful and consider as part of the totality of circumstances Deputy's claim of sleeping in a cold cell, of being threatened by the police with a "hollow point" in his head, and of being deprived of cigarettes and liquor. I am also mindful of the absence of

---

**24.** As we noted in *Riley,* the defendant in *Whalen, supra,* was found guilty of committing a murder during the commission of a violent rape rather than during a robbery as in the other death penalty cases.

proof by the State of an actual verbal or written relinquishment by Deputy of his right to counsel after his appearance before the committing Justice of the Peace. But sometimes actions speak louder than words.

Although the Trial Judge specifically ruled that Deputy knowingly and voluntarily relinquished his Fifth Amendment right to counsel when he gave his February 8, 1979 statement at 10:00 p.m., he did not explore the impact of the Sixth and Fourteenth Amendments right of defendant to have counsel present during any further interrogation after his initial appearance before the Justice of the Peace. The question was not raised either during the suppression hearing or at trial. But in *Flamer*, we assumed, and I do the same here, without agreeing with the assumption, that the Sixth and Fourteenth Amendments right to have counsel present were triggered by defendant's initial appearance before the committing Justice of the Peace, an impartial State Court Official.

Pursuant to the mandate of Justice of the Peace Criminal Rule 2(b), Deputy was advised at his initial appearance before the committing Justice of the Peace, a neutral judicial officer, of the complaint against him, of his right to retain counsel, and of his right to have a preliminary hearing. Deputy also was advised under the Rule that he was not required to make a statement, that any statement made by him may be used against him and that he would be allowed by the Justice of the Peace a reasonable time and opportunity to consult counsel. Having been so advised, Deputy expressed no desire to exercise any of the options explained to him and was thereupon ordered committed to the custody of the Sussex County Correctional Institution since the murder charges constituted nonbailable offenses. As was Flamer, Deputy was turned over to the State Police for transmittal to the Sussex County Correctional facility. The State Police delayed taking Deputy to the corrections facility and returned Deputy to the Police Station

where he was detained nine hours. There was little, if any, communication with Deputy by the investigating officer or any other police officer during the nine-hour period he was confined to the holding cell at the police barracks. The detective in charge of the investigation did inform Deputy that he was going to Seaford and that when he returned he wanted Deputy to tell him the truth. But subsequent to returning from Seaford, the detective apparently was satisfied not to interrogate Deputy further and left the police troop for home and the night without any contact with Deputy. Shortly after the detective left for home, a traffic officer started Deputy on his way to the Sussex County Correctional Institute. In the meantime, the detective changed his mind and directed the transporting officer to return Deputy to the police station.

I do not in any way condone the action of the State Police in failing to transport Deputy to the correctional facility without delay after his arraignment before the Justice of the Peace. Unfortunately, the delay was the result of a police procedure which had become routine, at least in lower Delaware, by reason of the Justices of the Peace as a general rule having no one available to relieve the State Police of custody of committed defendants for the purpose of transporting such defendants to a correctional facility. Although the police did transport Deputy to the Sussex County Correctional facility and hence, did not violate the Order of the Justice of the Peace, transportation of a defendant after arraignment, to a correctional facility, should occur without delay. This would avoid potential Fifth and Sixth Amendment violations whose frequency of occurrence seems to increase when a defendant is left in police custody for a prolonged period of time.

As to the alleged Sixth Amendment violation, I conclude no violation occurred since considering the totality of circumstances Deputy waived his Sixth Amendment right to counsel. In the recent case of *U.S. v. Karr*, 9th Cir., 742 F.2d 493 (1984), the

Court of Appeals for the Ninth Circuit held that *Miranda* warnings sufficiently inform an *indicted* defendant of the right to counsel under the Sixth Amendment to allow an intelligent waiver of that right. Recognizing the difference between the Fifth Amendment right to counsel under *Miranda* and the Sixth Amendment right, the Court stated:

The Sixth Amendment right to counsel is analytically distinct from the Fifth Amendment right created by *Miranda. Rhode Island v. Innis,* 446 U.S. 291, 300 n. 4, 100 S.Ct. 1682, 1689 n. 4, 64 L.Ed.2d 297 (1980). The right attaches "when formal judicial proceedings are initiated against an individual by way of indictment, information, arraignment, or preliminary hearing." *United States v. Gouveia,* [467] U.S. [180], 104 S.Ct. 2292, 2296, 81 L.Ed.2d 146 (1984). Unlike the Fifth Amendment right, the Sixth Amendment right does not depend on an explicit request by the defendant. *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977).

Karr's rights under the Sixth Amendment attached when he was indicted. The issue is whether he validly waived them.

The standard for waiver of the Fifth and Sixth Amendment rights to counsel is the same: the waiver must be (1) voluntary, and (2) a knowing and intelligent relinquishment of a known right or privilege. *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981) (Fifth Amendment); *Brewer v. Williams,* 430 U.S. at 404, 97 S.Ct. at 1242 (Sixth Amendment). Courts have split, however, regarding what *warnings* are required before an indicted defendant can knowingly and intelligently waive the Sixth Amendment right.

The Second Circuit takes the strictest view. It has held that waiver of the right to counsel before trial requires "a clear and explicit explanation of the Sixth Amendment rights defendant is giving up." *United States v. Mohabir,* 624 F.2d 1140, 1150 (2d Cir.1980). *Miranda*

warnings alone are insufficient. Further, it has held that the rights must be explained by a neutral judicial officer, not by the prosecutor or agent seeking the waiver. *Id.* at 1153. The officer must show the indictment to the defendant, explain its significance, and highlight the seriousness of the defendant's position. *Id. See also United States v. Brown,* 699 F.2d 585, 588–89 (2d Cir. 1983).

No other circuit has adopted this standard. The Fifth and Sixth Circuits have found informed waivers where the defendant has received *Miranda* warnings and has indicated a willingness to talk. *Jordan v. Watkins,* 681 F.2d 1067, 1075 (5th Cir.1982); *United States v. Brown,* 569 F.2d 236, 238–39 (5th Cir.1978) (en banc); *United States v. Woods,* 613 F.2d 629, 634 (6th Cir.), *cert. denied,* 446 U.S. 920, 100 S.Ct. 1856, 64 L.Ed.2d 275 (1980).

The Seventh Circuit has endorsed a case-by-case approach. *Robinson v. Percy,* 738 F.2d 214 at 222 (7th Cir., 1984). It has found waiver where the defendant received *Miranda* warnings and the surrounding circumstances show that he understood his right to counsel. *Id.*

Other circuits have adopted intermediate positions. *See United States v. Payton,* 615 F.2d 922, 924–25 (1st Cir.) (valid waiver where defendant was given *Miranda* warnings and was informed of indictment), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 830 (1980); *United States v. Clements,* 713 F.2d 1030, 1036 (4th Cir.1983) (waiver requires knowledge of indictment), *vacated by an equally divided court,* 728 F.2d 654 (4th Cir.1984) (en banc); *Fields v. Wyrick,* 706 F.2d 879, 881–82 (8th Cir.) (waiver where defendant was given *Miranda* warnings, had previously invoked right to counsel, and had opportunity to consult counsel during interrogation), *cert. denied,* [464] U.S. [1020], 104 S.Ct. 556, 78 L.Ed.2d 728 (1983).

*Karr,* 742 F.2d at 495.

Listening to the tape of the confession taken at 10:00 p.m. on February 8, 1979

gives one the impression of a man who is knowingly, voluntarily and unhesitatingly answering every question put to him truthfully, directly, and without further subterfuge. To emphasize the point I quote Deputy's final statements given at the very end of his 10:00 p.m. statement:

Q. You sure there is nothing you haven't told us about this incident?

A. I have told you everything. Everything.

Q. You killed Miss Alberta Smith?

A. I guess so. I don't know.

Q. What do you mean you guess so?

A. I don't know whether she was dead or not. She wasn't moving.

Q. You're reasonably sure she was dead. Probably she was dead.

A. Yeah.

Q. And there is no question about the truth. Everything you've told us is definitely the truth?

A. Everything is the truth.

Q. O.K. Have you been explained your *Miranda* rights? Your right to be silent and your right to an Attorney and all that?

A. Yes.

Q. How many times have you been told that since you have been apprehended?

A. Two or three.

Q. Have you been asked if you want to see an Attorney?

A. Yes.

Q. Have you had the opportunity to talk to an Attorney if you wanted to see one?

A. Yes.

I also look at Deputy, the thirty year old man, who is no stranger to the rigors of law enforcement, a thrice convicted felon, and under arrest for an unrelated murder allegedly committed by him in New Castle County. The evidence clearly supports a conclusion that Deputy is street wise. Had he wished to invoke any of his Fifth, Sixth and Fourteenth Amendment rights, which he consistently declined to do each time those rights were explained to him from the moment of his apprehension, the clear inference is that he was knowledgable and wise enough to have done so had he so desired. His failure to request the assistance of counsel under the totality of the circumstances here can lead to no conclusion other than that he was willing to waive his right to consult or have counsel present and to spar with the police on his own. He knew his rights and said so. Based upon the totality of the circumstances I am satisfied the 10:00 p.m. statement under attack was properly admitted into evidence and that all convictions and sentences should have been affirmed.