Lloyd C. FULLMAN and Shelby S. Stewart, Defendants below, Appellants,

v.

STATE of Delaware, Plaintiff below, Appellee.

Supreme Court of Delaware.

Submitted Nov. 15, 1977.

Decided June 6, 1978.

John M. Willard and Richard W. Baseman, Asst. Public Defenders, Wilmington, for Fullman, defendant below, appellant.

Edward Z. Sobocinski, Wilmington, for Stewart, defendant below, appellant.

Edward C. Pankowski, Jr., Deputy Atty. Gen., Wilmington, for plaintiff below, appellee.

Before HERRMANN, C. J., DUFFY and McNEILLY, JJ.

McNEILLY, Justice:

Defendants were convicted of attempted robbery in the first degree (11 *Del.C.* § 832), attempted murder (11 *Del.C.* § 635) and conspiracy (11 *Del.C.* § 512), each in the second degree, and of several counts of possession of a deadly weapon during the commission of a felony (11 *Del.C.* § 1447); defendant Fullman was separately convicted of possession of a deadly weapon by a person prohibited (11 *Del.C.* § 1448). They appeal raising a variety of constitutional challenges to their convictions centering on allegedly coercive tactics used by police when securing statements from the defendants. Also challenged as error is the Superior Court's failure to merge the sentences for the weapons charge with the sentences imposed for the other crimes of which defendants were convicted, the denial of the motion to sever the trial of defendants, and the admission into evidence of the in-court identification of defendants by the victim of their crimes. The majority of this Court find no constitutional or other error in the proceedings, and affirm.

I

In the early morning hours of Friday, April 9, 1976, an off-duty Wilmington police officer was shot and seriously injured as he was investigating the suspicious activity of two persons. In a seemingly unrelated incident later that same morning, defendant Fullman failed to appear in Superior Court at his scheduled sentencing on the charge of felony-theft (11 *Del.C.* § 841), of which he had recently been convicted, and because of his failure to appear, Fullman's bail was declared forfeited and a Superior Court capias [1] was issued for his arrest.

The shooting precipitated an intense investigative effort by Wilmington and State Police which eventually focused on the defendants. The police found a spent .22 calibre bullet casing at the scene of the shooting, and an examination of the records of sales of .22 calibre guns revealed to the police a recent purchase by Fullman. As a convicted felon Fullman was barred by law from purchasing or possessing a deadly weapon (11 *Del.C.* § 1448), and, therefore, the information concerning Fullman's purchase gave the police cause to suspect that Fullman had violated § 1448, and that he may have been involved in the shooting of the police officer. A search pursuant to a valid warrant of Fullman's residence executed the same night produced a .22 calibre shell identical to the one found at the scene of the shooting. On Saturday, April 10th, the Wilmington police obtained an arrest warrant for Lloyd C. Fullman, Jr., on the charge of possession of a deadly weapon by a person prohibited, but a search for him that day, including a stop at the residence of his parents, proved unsuccessful.

Sunday morning at approximately 1 A. M. Fullman, accompanied by his mother and stepfather, voluntarily appeared at the Wilmington Bureau of Police. Fullman was immediately arrested pursuant to the Superior Court capias and the warrant on the weapons charge, and was advised of his legal rights in accordance with the dictates of *Miranda v. Arizona,* 348 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). While in the presence of his parents, Fullman was

---

1. A Superior Court capias takes the following form:

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE IN AND FOR NEW CASTLE COUNTY

To Any Sheriff, Constable or Peace Office Of The State of Delaware:

YOU ARE HEREBY COMMANDED that you apprehend _____ to keep him safe and bring him before the Judges of the Superior Court at Wilmington on _____ to answer for _____

contrary to the Constitution and Laws of this State. Have you then and there this Writ.

WITNESS the Honorable _____

Superior Court Judge _____ this _____ day of _____, A.D. 19__.

_____
Prothonotary

_____
Deputy Prothonotary

questioned for approximately one hour concerning the charges against him and the shooting of the police officer. Throughout the interrogation Fullman's parents urged that he co-operate with the police. Fullman and his parents agreed that in order to prove that he was truthfully answering the questions put to him, he should take a polygraph test, and arrangements were made for the test to be administered later that morning. Fullman and his parents were informed that he was a suspect in the shooting of the police officer, and would be asked questions concerning the shooting during the polygraph test. Fullman's parents were also told that he would have to be incarcerated at least until the Superior Court convened on Monday, April 12th, in reference to the capias of that Court. The parents left, and at approximately 3 A. M., after an arrest report had been completed, Fullman was taken to the City turnkey who placed him in a cell for the balance of the night.

The polygraph testing was scheduled to begin at 11 A. M. Sunday morning, and shortly before that time Fullman's parents returned to the police station. Fullman was brought from his cell block, and allowed to converse with his parents as he ate food brought to him by his mother. The police polygraph expert, Detective Charles Burke, discussed the test with Fullman and his parents. Detective Burke later testified that Fullman and his parents agreed to the test, and were in fact anxious that it be administered so that Fullman would have the opportunity to prove his non-complicity in the shooting of the police officer.

At about 1 P. M., after again explaining to Fullman his *Miranda* rights, Detective Burke began the polygraph examination. The testing took approximately three hours to complete as thirteen separate test-charts were made. Detective Burke advised Fullman to complain if he felt fatigued and allowed him a break after each chart. At no time during the testing did Fullman complain of or show effects of fatigue. A one-half hour break was allowed at the mid-point of the test. Detective Burke later testified that although he normally ran 5 or 6 test-charts, he felt thirteen were

necessary in this instance because the initial tests showed that Fullman was lying. At 4 P. M. Fullman was placed in the custody of Detective Ronald Mullin.

Detective Mullin and Deputy Attorney General Charles Brandt began questioning Fullman at 5:30 P. M. At this point the police had what they believed to be overwhelming evidence that Fullman had been involved in the shooting, i. e., the physical evidence found at the scene of the crime and at Fullman's residence, and the polygraph test results which showed that Fullman was lying when he denied complicity in the shooting. The authorities began to use what defense counsel characterize as the "personal" approach. Deputy Attorney General Brandt explained to Fullman that it would be in his best interests to tell everything he knew about the shooting, although Mr. Brandt was emphatic about not making any "deals" with Fullman prior to indictment. Several police officers informed Fullman that they would be "with him throughout the entire proceedings" if he did the right thing and talked. Deputy Attorney General Brandt candidly testified later that the police approach was geared to making certain that the defendant did not request the presence of an attorney by making him feel comfortable with the police officers. However, Mr. Brandt also testified that had Fullman stated that he did not want to answer questions until he spoke with an attorney, the request would have been honored.

Detective Mullin and Deputy Attorney General Brandt discontinued the questioning at 7 P. M. when Fullman's girl friend arrived at the police station. Fullman seemed relaxed throughout the interrogation, and readily ate the food brought to him by his girl friend. At 7:45 P. M. Fullman was photographed for identification. Between 9:30 P. M. and 10 P. M. Fullman was taken by Detective Jonathan Sines along with Deputy Attorneys General Milton Shafran and Charles Brandt to the Youth Aid Division for further questioning. Fullman was again given the *Miranda* warnings, and shortly thereafter, Fullman gave a complete statement implicating him-

self and defendant Stewart in the shooting of the police officer. Fullman was then booked at 11:30 P. M. on charges of attempted murder, robbery, and conspiracy and placed in a detention cell.

Using the statement of Fullman as evidence of probable cause, Detective Burke secured an arrest warrant for defendant Stewart from Municipal Court Commissioner, Roger Barton. At 2:10 A. M. on the morning of April 12, 1976, Stewart was arrested at his residence in Newark, Delaware. Within three hours of his arrest Stewart made oral and written statements in which he admitted that he was present at the scene of the police officer's shooting, but asserting that Fullman had been the one who actually fired the shot.

## II

### A.

Defendant Fullman argues that the statement which he made to the police was involuntary and a product of improper police tactics. Defendant Stewart argues that since his arrest was based on the unlawfully obtained statement of Fullman, his arrest and later statement were illegally obtained, and inadmissible at trial as the "fruit of the poisonous tree". See *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The United States Supreme Court in the landmark decision of *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973), analyzed the law of voluntariness of confessions in the following manner:

This Court's decisions reflect a frank recognition that the Constitution requires the sacrifice of neither security nor liberty. The Due Process Clause does not mandate that the police forgo all questioning, or that they be given carte blanche to extract what they can from a suspect. "The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Culombe v. Connecticut*, supra, 367 U.S. [568,] at 602, 81 S.Ct. [1860] at 1879 [6 L.Ed.2d 1037.]

In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, e. g., *Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224; his lack of education, e. g., *Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975; or his low intelligence, e. g., *Fikes v. Alabama*, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246; the lack of any advice to the accused of his constitutional rights, e. g., *Davis v. North Carolina*, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895; the length of detention, e. g., *Chambers v. Florida*, supra [309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716]; the repeated and prolonged nature of the questioning, e. g., *Ashcraft v. Tennessee*, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; and the use of physical punishment such as the deprivation of food or sleep, e. g., *Reck v. Pate*, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948. In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted. *Culombe v. Connecticut*, supra, 367 U.S., at 603, 81 S.Ct., at 1879.

The significant fact about all of these decisions is that none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances.

See also *Mealey v. State*, Del.Supr., 347 A.2d 651 (1975).

■ We examine the circumstances surrounding the arrests and the taking of the

statements to determine the legality of the police activities and the voluntariness of the defendants' confessions. Initially it should be noted that whether a statement was voluntarily made or was the product of duress and coercion is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte,* supra, and where there is sufficient evidence of record to support the lower Court's finding of voluntariness this Court will not upset that finding, and the admission of the confession into evidence based thereon. Cf. *Henry v. State,* Del.Supr., 298 A.2d 327 (1972).

■ The majority of this Court agree with the opinion of the Trial Court that the statements made by the defendants were freely and voluntarily given, and therefore, they were admissible as evidence at trial. As the United States Supreme Court stated in *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977):

Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of the law enforcement system which may ultimately cause the suspect to be charged with a crime.

However, the record in the case at bar contains no evidence of threats, physical abuse or other coercion by the police at any time during the investigative process. Fullman voluntarily appeared at the police station to answer questions and to determine what charges were pending against him. Fullman's parents were allowed to be present at the station house at all times except for the period when Fullman was placed in a cell for the purpose of sleeping. Fullman was allowed to converse with his parents and girl friend, and was able to eat the food brought to him by his parents and friend as a supplement to the prison food. He was allowed ample periods of rest without any apparent restraint between sessions of questioning, and at no time did he show effects of, or complain of fatigue. In addition, Fullman was advised of his constitutional rights on at least three separate occasions. He had an 11th grade education, and had had previous dealings with both the police and the criminal justice system, as evidenced by his previous arrest and conviction for felony-theft. From the totality of the circumstances, we conclude that Fullman's statement was voluntary. Compare *Lasby v. State,* Del.Supr., 185 A.2d 271 (1962).

Defendant Fullman, however, argues that even if his statement was voluntary, it was taken in violation of his statutory right to appear, without unreasonable delay after arrest, before a committing Magistrate, citing 11 *Del.C.* § 1909.[2] Therefore, Fullman contends that his statement, as a product of unreasonable delay between arrest and initial appearance, constitutes inadmissible evidence. *Webster v. State,* Del.Supr., 213 A.2d 298 (1965); *Vorhauer v. State,* Del. Supr., 212 A.2d 886 (1965).

Superior Court Criminal Rule 5(a), which implements 11 *Del.C.* § 1909 and reflects a State policy to provide a speedy preliminary hearing, reads as follows:

### RULE 5. INITIAL APPEARANCE BEFORE THE COMMITTING MAGISTRATE

(a) Initial Appearance. An officer making an arrest with or without a warrant or any other authorized peace officer shall take the arrested person without unreasonable delay before the nearest available Justice of the Peace of the county in which the offense is alleged to have been committed, a judge of the Municipal Court for the City of Wilmington, or the court out of which the warrant issued in accordance with the command

---

2. 11 *Del.C.* § 1909 reads in full as follows:
§ 1909. Hearing without delay; permissible delay.
If not otherwise released, every person arrested shall be brought before a magistrate without unreasonable delay, and in any event he shall, if possible, be so brought within 24 hours of arrest, Sundays and holidays excluded, unless a resident judge of the county where he is detained or of the county where the crime was committed for good cause shown orders that he be held for a further period of not exceeding 48 hours.

of the warrant. When an arrest is made without a warrant, a complaint shall be filed forthwith which shall comply with the requirements of Rule 4(a) with respect to the showing of probable cause. In *Warren v. State*, Del.Supr., 385 A.2d 137 (1978), this Court when referring to the policy of speedy preliminary hearings stated:

> The first step in providing that right after arrest is, of course, the "initial appearance" before the "nearest available" Justice of the Peace. Rule 5(a). If the Superior Court determines that there was unreasonable delay in taking an arrested person before a judicial officer, and that the detention was unlawful, then, under settled Delaware law, evidence obtained during such period is inadmissible at trial. (citations omitted)

We must examine, then, the period of delay between Fullman's arrest and his initial appearance to see if it was unreasonable delay.

■■■ Fullman voluntarily surrendered to the police between the hours of 1 A. M. and 2 A. M. on a Sunday, and was booked at 11:30 P. M. the same day, after approximately 9 hours of questioning within the approximately 21 hours from the time of surrender. While a delay may be "unreasonable" though less than the 24 hour outer limit set forth in 11 *Del.C.* § 1909, no clear cut standards of reasonableness may be prescribed. Each case must be considered on its own facts with the number of hours of detention prior to the initial appearance together with all other circumstances being considered. *Webster v. State,* supra. In the case at bar, an atmosphere of cordiality and mutual trust permeated the proceedings. The interrogations took place on a Sunday,[3] and were the culmination of an extended weekend of intensive investigative efforts by the police. Part of the delay period included the time from 3 A. M. to 11 A. M. when defendant was resting in anticipation of the polygraph test which he had requested be administered, and the time from 11 A. M. to 4 P. M. when the prelimi-

naries for, and the testing actually took place. We emphasize that the polygraph was administered at Fullman's request. Eliminating the sleep and testing time, the delay chargeable to the police was a period of no more than 5 to 6 hours. The majority of this Court, under the totality of the circumstances doctrine, find the delay here to be reasonable, rendering Fullman's statement admissible. Compare *Vorhauer v. State,* supra. See also *Thompson v. State,* Del.Supr., 174 A.2d 141 (1961).

■■ We also find nothing in the record to indicate that Stewart's statement was made under threats or coercive pressure. Stewart was truthfully informed that Fullman had previously given a statement implicating Stewart in the shooting. Thereafter, Stewart confessed to his complicity in the crime. Stewart's contention that his confession was a product of the illegal tactics used against Fullman must, of course, fail because we have decided that Fullman's confession was legally obtained.

### B.

Defendant Stewart contends that his arrest was unlawful because the arrest warrant was not supported by an affidavit sufficient to establish probable cause. See Super.Ct.Crim.R. 4(a). Asserting a violation of his own constitutional rights, Stewart alleges that his confession was the result of an illegal arrest, and should have been suppressed. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

■■ Defendant Stewart reads Superior Court Criminal Rule 4(a) to require, in each case where an arrest warrant is requested, an affidavit which states facts sufficient to establish probable cause. Rule 4(a) states:

### RULE 4. WARRANT OR SUMMONS UPON COMPLAINT

(a) Issuance. If it appears from the complaint, or from an affidavit or affidavits filed with the complaint, that there is probable cause to believe that an offense

---

**3.** Indeed 11 *Del.C.* § 1909 excludes Sundays and holidays from the 24 hour outer limit for detention between arrest and initial appearance.

has been committed and that the defendant has committed it, a warrant for the arrest of the defendant shall issue to any officer authorized by law to execute it. A summons instead of a warrant may issue in the discretion of the committing magistrate or other person authorized by law to issue a warrant. More than one warrant or summons may issue on the same complaint. If a defendant fails to appear in response to the summons or there is reasonable cause to believe he will not appear, a warrant may issue. In any case in which it is lawful for an officer to arrest a person without a warrant, he may, without a complaint having been made, issue a summons instead of arresting the person.

It is readily apparent that a warrant may be issued where facts constituting probable cause are contained in an affidavit, *or where sufficient facts appear in the complaint.* Superior Court Criminal Rule 3 requires a complaint to be made "upon oath before a committing magistrate." [4] In the case at bar the police officer swore to the facts of the complaint before a Wilmington Municipal Court Judge. Within those facts were the statement made by Fullman, plus the evidence corroborating the statement which included, *inter alia,* the matching bullet found at the scene of the crime. Therefore, the committing Magistrate had a statement of a co-conspirator, which due to its incriminating nature carries its own indicia of truthfulness, and corroborating evidence gathered by the police. Together the facts found in the complaint and in the oral statement made by the police officer are sufficient evidence of probable cause to meet statutory and constitutional mandates.

■ Defendant Stewart also contends that because the arresting officers did not have a copy of the arrest warrant in their

possession at the time of the arrest, it was illegal. An arrest by a peace officer pursuant to a valid warrant is lawful even though the warrant is not in his possession at the time of arrest. 11 *Del.C.* § 1906. Defendant's contention is without merit.

Defendant Stewart's arrest was lawful as pursuant to a validly issued arrest warrant. Therefore, Stewart's statement was not the product of an illegal arrest.

\* \* \* \* \* \*

We conclude that the police obtained the statements of the defendants in a legal manner, and they were voluntarily made. Therefore, the statements were properly admitted into evidence at trial.

## II

■ Defendants assert that the Superior Court erred by failing to instruct the jury on the lesser included offense of attempted robbery in the second degree. It is uncontested that a deadly weapon, the .22 calibre rifle, was used in the attempted robbery for which defendants have been convicted. Robbery in the first degree is defined in 11 *Del.C.* § 832(a) as follows:

§ 832. Robbery in the first degree.

(a) A person is guilty of robbery in the first degree when he commits the crime of robbery in the second degree and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime:

(1) Causes physical injury to any person who is not a participant in the crime; or

(2) Displays what appears to be a deadly weapon, or

(3) Is armed with and uses or threatens the use of a dangerous instrument.

---

4. Super.Ct.Crim.R. 3 reads in full as follows:

RULE 3. COMMENCEMENT AND COMPLAINT

Proceedings may be instituted by indictment (except where otherwise provided by the Constitution of this State), by complaint, or by arrest where arrest is permissible without a warrant.

The complaint is a written statement of the essential facts constituting the offense charged. It shall be made upon oath before a committing magistrate or any other person authorized by law to issue a warrant. The complaint may be based upon personal knowledge or upon reasonable information and belief.

Robbery in the first degree is a class B felony.

and robbery in the second degree is defined in 11 *Del.C.* § 831 as follows:

§ 831. Robbery in the second degree; class D felony.

A person is guilty of robbery in the second degree when, in the course of committing theft, he uses or threatens the immediate use of force upon another person with intent to:

(1) Prevent or overcome resistance to the taking of the property or to the retention thereof immediately after the taking; or

(2) Compel the owner of the property or another person to deliver up the property or to engage in other conduct which aids in the commission of the theft.

Robbery in the second degree is a class D felony.

The use of a deadly weapon elevates the robbery charge here to first degree. No credible evidence was presented below to support a finding of guilt of second degree robbery, and, therefore, no jury instruction on that crime was necessary. *Bailey v. State,* Del.Supr., 352 A.2d 411 (1976).

### III

Defendants assert that the Superior Court erred by failing to apply the doctrine of merger of offenses or sentences when the Court imposed a sentence for the weapons charge consecutive to that imposed for the other charges. Defendant's position is that identical evidence is necessary to prove the robbery charge and the charge of possession of a deadly weapon during the commission of a felony.[5] Therefore, the argument goes, the weapons offense merges into the robbery, and the other felonies, as it is unconstitutional to impose separate sentences for the crimes. *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *State v. Honie,* Del.Supr., 310 A.2d 872 (1973).

We disposed of a similar contention in a manner adverse to the position of defendants in the recent case of *Mackie v. State,* Del.Supr., 384 A.2d 625 (1978). In *Mackie* a criminal defendant argued that a § 1447 weapons possession charge merged into the felony of attempted assault in the first degree (11 *Del.C.* § 613). We rejected the defendant's contention in *Mackie* relying on *State v. Honie,* supra, where this Court held that a violation of the Felon's Firearm Possession Act (§ 1447) is a "separate, clear and unambiguous offense . . .". As a separate offense from the underlying felony, a § 1447 violation may be prosecuted along with the felony, and upon conviction of both, separate sentences may be imposed without violating any constitutional proscriptions.

In cases where a single transaction produces both a felony offense and a weapons charge, and the elements of each are identical, a judge in his discretion may merge sentences, but not offenses. See *State v. Dobrolenski,* Del.Supr., 328 A.2d 447 (1974). As stated in *Dobrolenski*:

. . . in his discretion, however, the sentencing judge could have ordered that the sentences be merged to run concurrently, the mandatory provisions of § 468A [now § 1447] notwithstanding, in order to avoid double punishment for substantially the same offense.

We find no abuse of discretion in the Superior Court's refusal to merge the sentences in the case at bar.

### IV

Defendant Stewart raises two contentions of which we may summarily dispose. Stewart contends that the Superior Court erred when it failed to sever his trial from that of his co-conspirator. We note that the motion for severance was not made until the fourth day of trial. The record supports the Superior Court decision that

---

5.  11 *Del.C.* § 1447(a) reads as follows:

§ 1447. Possession of a deadly weapon during commission of a felony; class B felony.

(a) A person who is in possession of a deadly weapon during the commission of a felony is guilty of possession of a deadly weapon during commission of a felony.

the motion for severance was neither meritorious nor timely.

■ Defendant Stewart also argues that the in-court identification of Stewart by Officer Heatherton was unconstitutional because the circumstances surrounding the identification were impermissibly suggestive. We reject this contention as the facts of record show that the identification was proper. Compare *Harris v. State,* Del. Supr., 350 A.2d 768 (1975).

\* \* \* \* \* \*

There being no error in the proceedings in the Superior Court, the convictions of Lloyd C. Fullman, Jr. and Shelby S. Stewart are

AFFIRMED.

DUFFY, Justice (concurring):

I agree that there was no reversible error in the Superior Court proceedings and, for that reason, I join in affirming the judgment.

In my view, the critical question in the case is whether the Wilmington police violated the law in securing a statement of guilt from defendant, Lloyd C. Fullman. Fullman was kept in custody by the police in the City jail for an unusually long period without an appearance before a Magistrate.[1] Some twenty-two hours passed between the time when he was arrested (after walking into the Station House about 1 A. M. on Sunday morning) and when he was first taken before a Magistrate. During that period he was questioned by five or six different officers and two Deputy Attorneys General, and he submitted to thirteen separate polygraph charts. That is an extraordinary litany of events which is troublesome, indeed.

But, as the majority opinion states, the police were required by the capias to produce Fullman before the Superior Court when it convened (at 10 A. M. on Monday morning). Given the hour and day at which Fullman presented himself, I cannot say that as a matter of law the police were required to send him to the Department of Corrections facility some thirty-five miles away, to remain for a few hours and then to be returned to Wilmington by 10 A. M. Monday. In saying this, I also note that Fullman's purpose in voluntarily appearing at the Police Station was to "clear" himself in the attempted murder investigation; that purpose, with the supportive efforts of his parents and girl friend, could not have been undertaken had he been removed to the Corrections facility at Smyrna. And if he lawfully remained in custody at the Station House, then the police, who were investigating an attempted murder, had a right to talk to him as they would any other person who may have had knowledge of the crime. That right, of course, was subject to the binding law announced in *Miranda v. Arizona,* 348 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the tests which must be applied under *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The majority opinion summarizes the State's side of the evidence, and I shan't repeat it. The Trial Judge made specific findings under both *Miranda* and *Bustamonte* and I cannot say, as a matter of law, that his rationale or his conclusion was wrong.

I therefore conclude, in this close and difficult case, that the judgment should be affirmed.

---

1. "Unreasonable delay" is the test under Superior Court Criminal Rule 5(a). See the discussion in *Warren v. State,* Del.Supr., 385 A.2d 137 (1978).