**STATE of Delaware**

v.

**Kevin B. COYLE, Defendant.**

Superior Court of Delaware,
New Castle County.

Submitted: June 16, 1989.
Decided: Sept. 29, 1989.

William L. George, Jr., and Thomas H. Ellis, Deputy Attys. Gen., for State.

Eugene J. Maurer, Jr., of Eugene J. Maurer, Jr., P.A., Wilmington, for defendant.

HERLIHY, Judge.

This matter is before the Court on the motion of defendant Kevin Coyle [defendant] to suppress several statements he gave to law enforcement authorities. Defendant is charged with manslaughter (11 *Del.C.* § 632) arising out of a motor vehicle accident at Second and Adams Streets in the City of Wilmington on August 2, 1988 in which Brenda Walker [Walker] died.

I

Most of the facts developed at the suppression hearing are not in dispute. Patrolman Richard Wisher [Wisher] of the Wilmington Police Department responded to the scene of the accident at approximately 12:23 a.m. on August 2, 1988. He observed two vehicles, one was a Honda which still contained Walker laying seriously injured across the front seat and the other was a Bronco which the defendant was standing near.

Wisher asked the defendant if he had been driving the Bronco to which he replied "yes". He asked the defendant for his license, registration and insurance. The defendant produced papers for the first

two requests but said he had no insurance. Wisher noticed an odor of alcohol on the defendant's breath. During this initial conversation, Wisher also noted the defendant was a little unsteady on his feet and had a very slight speech slur. Wisher testified that at the end of this first interview, he was considering an arrest for driving under the influence. At no time during this initial conversation did Wisher advise defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). At the conclusion of the first conversation, Wisher advised the defendant to remain by his vehicle. He did not issue a citation for failure to have insurance.

Fifteen minutes later, Wisher returned to the defendant who was still standing by his Bronco. In this intervening time, he learned that Walker's injuries were more serious than originally thought, possibly a fatality. Upon returning to the defendant, Wisher asked him how the accident happened, to which the defendant responded. Wisher also asked the defendant if he had been drinking and he said he had several beers. This admission was the only new information Wisher had at the second interview on the issue of defendant's drinking. Wisher then placed him under arrest for driving under the influence, handcuffed him, read him his *Miranda* rights for the first time and placed him in a police car.

Patrolman Wayne Brown [Brown], a fatal accident investigator, arrived at the accident scene around 1:00 a.m. He saw the defendant handcuffed in the back of a police car. He was identified as the driver of the *striking* vehicle in a serious accident. Curiously, Brown did not discuss the situation with Wisher and did not learn or determine that the defendant was under arrest.

Brown made certain physical observations of the defendant and concluded he was too intoxicated to be driving. He explained to the defendant who he was, that there was a serious accident and then advised him of his *Miranda* rights. Brown asked the defendant if he had been drinking and was told he had had six beers. Brown placed the defendant under detention for further investigation, i.e., coordination and breathalyzer tests.

Brown and the defendant left the accident scene for the police station around 1:30 a.m. After coordination tests, two breathalyzer tests were administered, the last being at 2:54 a.m. Following that test, Brown asked the defendant the standard series of questions on the Alcohol Influence Report form. Brown arrested him for driving under the influence, returned the defendant to a cell and then returned to the accident scene for about two and one-half hours.

Brown learned around 4:00 a.m. that Walker had died. The investigation at the scene involved checking problems with the skid marks; examining the vehicles and gathering evidence. There was a concern about the impact on the evidence gathering due to the resumption of traffic flow through the scene.

Brown returned to the police station around 5:30–5:40 a.m. He contacted Deputy Attorney General Keith A. Trostle [Trostle] around 6:00 a.m. and around 6:30 a.m. he went to the defendant's cell and took him to an interview room. Brown stated the defendant said little but that he asked what was going to happen to him and possible penalties.

Brown advised the defendant of Walker's death. He advised him again of his *Miranda* rights. The atmosphere appeared cordial. After advising him of his rights, Brown asked six questions but before he asked the seventh, Brown testified that the defendant "told me that he didn't want to answer any further questions, that he wanted to speak to an attorney." Brown ended the interview.

The defendant was returned to his cell. No attorney was called and the Public Defender's Office was not contacted. Defendant was not afforded an opportunity to contact a lawyer. Brown returned to the accident scene, apparently for several hours, in part to see it in daylight.

At 4:30–5:00 a.m. Brown believed he had enough information to arrest the defendant for vehicular homicide. He was, however, told by his supervisor to wait before mak-

ing that arrest. He testified that the decision of what to charge and when was not his.

Municipal Court opened for business at 9:00 a.m. on August 2 and normally someone arrested for driving under the influence would have been taken to that Court at 9:00 a.m. This defendant was not. Brown had returned to the police station before 9:00 a.m. No paperwork was ever prepared memorializing the arrest for driving under the influence.

Attorney General Charles M. Oberly, III, contacted Deputy Attorney General Stephen M. Walther [Walther] around 9:30–10:00 a.m. requesting him to become involved in the investigation. Walther and Trostle met with several Wilmington police officers regarding the case but Brown was not one of them. The prosecutors were informed of some of what the investigation had determined and that the defendant had invoked his *Miranda* rights after being advised of them.

Walther indicated to the police that they must be aware of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) problems and not initiate any further conversations with the defendant, which advice was not passed onto Brown. Brown met with Trostle around noon after spending several hours at the police station writing reports and speaking with his supervisor.

At the noon meeting, Trostle requested the police to take the defendant to a hospital for a blood test, if the defendant consented. Brown and Patrolman Stewart [Stewart] went to the defendant in his cell and obtained the defendant's consent. The three of them left for the hospital at 12:30 p.m. and on the way, Brown explained that the Attorney General's Office requested a blood sample be taken.

At this point, the first significant divergence in the testimony appears. At the hospital, while waiting for the phlebotomist, Brown and Stewart (who did not testify at the hearing) discussed taking measurements and other investigative steps they could do differently in other investigations but in the context of this investigation.

Brown testified that the defendant "suddenly initiated a conversation" with him which he took to be the defendant's effort to begin explaining his version of the accident.

Brown testified that he cut the defendant off, reminding him of his prior invocation of his right to not say anything. He told the defendant that if he wanted to say anything, the Attorney General's Office was now involved and he would have to speak to them, mentioning Walther and Trostle by name. Brown testified that the defendant wanted to speak to the them. There was no conversation at this point about the defendant's specific invocation of his right to counsel and no effort was made to contact counsel or allow the defendant to contact counsel.

The defendant testified that while waiting at the hospital for the blood sample to be drawn, the officers mentioned that they had witnesses indicating he was speeding and had run a red light. The defendant said such information prompted him to request the police to contact the prosecutor. Brown did not deny making these remarks but testified, while it was possible he made them, he could not recall making them.

An interview was set up at the Attorney General's Office where the officers and defendant arrived around 1:30 p.m. Brown met with Trostle outside the defendant's presence but did not inform him that the defendant had specifically invoked his right to counsel. A taped interview was arranged. Present were the two officers, Walther, Trostle and the defendant. Prior to turning on the tape recorder, Walther reminded the defendant that he had been warned of his rights and could have an attorney present and that he was in the Attorney General's Office because he, the defendant, had requested it, all of which the defendant acknowledged. The taped statement began at 1:45 p.m. and concluded at 2:15 p.m. After the taking of the statement, the defendant was arrested for vehicular homicide, taken to Justice of the Peace Court 18 at Gander Hill prison where he was arraigned around 6:00 p.m.

## II

The defendant specifically moves to suppress two statements. The first statement is the second conversation between himself and Wisher at the accident scene, immediately following which the defendant was arrested for driving under the influence. The grounds for suppression are that the statement was taken in violation of his *Miranda* rights. The second statement defendant seeks to suppress is the statement given to the Attorney General's Office. The grounds for suppression of that statement are that (1) it occurred during a period of unreasonable delay in taking him before a magistrate and/or (2) it was taken in violation of *Miranda* and *Edwards*.

## III

The admissibility of defendant's second "statement" to Wisher revolves around a determination of whether Wisher was conducting custodial interrogation. *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706; *Berkemer v. McCarty,* 468 U.S. 420, 433, 104 S.Ct. 3138, 3147, 82 L.Ed.2d 317, 330 (1984). Each case must be examined on its own circumstances to determine whether a suspect is in custody. *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279 (1983).

A traffic stop is a seizure within the meaning of the Fourth Amendment. *Berkemer,* 468 U.S. at 436–37, 104 S.Ct. at 3148, 82 L.Ed.2d at 332–33; *see United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). *Miranda* warnings are required for custodial interrogation of persons involved in motor vehicle violations. *Berkemer* 468 U.S. at 440, 104 S.Ct. at 3150, 82 L.Ed.2d at 335; *Roberts v. State,* Del.Supr., 494 A.2d 156 (1985). Where, however, the initial stop is for an ordinary traffic stop, the initial on-the-street questioning is not custodial and no *Miranda* warnings are required. *Berkemer* 468 U.S. at 440–41, 104 S.Ct. at 3150–51, 82 L.Ed.2d at 334–35; *Pennsylvania v. Bruder,* — U.S. —, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988).

The ultimate inquiry, therefore, is whether there has been a formal arrest. *"Miranda* warnings are required only when there has been such a restriction on a person's freedom as to render him 'in custody'." *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

In *Berkemer,* the Supreme Court rejected a "bright line" rule that *Miranda* applies to all traffic stops or only when the suspect is formally arrested. *Berkemer,* 468 U.S. at 441, 104 S.Ct. at 3151, 82 L.Ed.2d at 335. The Supreme Court in *Berkemer* repeatedly referred to the issues as involving *Miranda* and *ordinary* traffic stops. One reason for that label was that the Court viewed questioning on the highway as less coercive than in a police station, more open to public view and a circumstance less likely to involve abuse.

In this case, we have questioning at the scene in public view, at least public view in that a number of spectators were fifty feet or so from the defendant while he was being questioned on both occasions by Wisher. Therefore, those factors upon which the Supreme Court relied to rule that the police did not have to issue *Miranda* warnings are present here.

There are other factors, however. We know that the defendant was not *formally* arrested until shortly, if not immediately, after answering Wisher's second set of questions. Therefore, we are in that twilight zone created by the Supreme Court's choice not to create a bright line rule (for a number of good reasons which it discusses) in *Berkemer.*

At the time Wisher first approached the defendant, the case was not an ordinary traffic stop. The police had not pulled over a suspected drunk driver for initial questioning. They responded to the scene of an accident which Wisher knew was serious from his initial observation of the victim *prior* to his first encounter with the defendant.

Wisher testified that during his initial questioning, the defendant displayed signs

of being under the influence. Wisher admitted that at the conclusion of this first conversation, he considered prosecution for being under the influence possible. He concluded the first encounter with defendant by telling him to wait at his vehicle. The defendant waited for fifteen to twenty minutes alone at his vehicle. During that interval, Wisher became aware that the injuries to the victim were extremely serious, more so than originally thought, possibly fatal.

Clearly, the situation was no longer an "ordinary traffic stop". Wisher questioned the defendant at his vehicle where he had waited as requested. The questions were few and addressed the heart of the accident, (1) drinking and (2) causation. While the defendant was not then informed of Walker's serious condition, he presumably could see much activity around her car, which was up on a grass plot. Defendant knew he was not free to leave and he knew he had no insurance.

Under these circumstances, this Court holds that the defendant was in custody for purposes of *Miranda*. His movement was restricted as he had been told to wait and any brief initial investigatory period such as associated with an ordinary traffic stop had passed. This was not an ordinary traffic stop. Not only was defendant waiting at the command of the officer, he was back in his immediate presence when the questioning resumed. Consequently, he should have been advised of his *Miranda* rights. Since he was not so advised, the motion to suppress the second statement given to Wisher will be GRANTED and that statement is hereby SUPPRESSED.

## IV

■ Defendant has moved to suppress his statement given in the Attorney General's Office between 1:45 p.m. and 2:15 p.m. By that time, he had been in law enforcement custody since just before 1:00 a.m. when he was arrested by Wisher. Defendant contends this statement was obtained during an unreasonable delay in bringing the defendant before a magistrate.

11 *Del.C.* § 1909 provides:

If not otherwise released, every person arrested shall be brought before a magistrate without unreasonable delay, and in any event he shall, if possible, be so brought within 24 hours of arrest, Sundays and holidays excluded, unless a resident judge of the county where he is detained or of the county where the crime was committed for good cause shown orders that he be held for a further period of not exceeding 48 hours.

Also, Superior Court Criminal Rule 5(a) provides:

**Initial Appearance.** An officer making an arrest with or without a warrant or any other authorized peace officer shall take the arrested person without unreasonable delay before the nearest available Justice of the Peace of the county in which the offense is alleged to have been committed, a judge of the Municipal Court for the City of Wilmington, or the court out of which the warrant issued in accordance with the command of the warrant. When an arrest is made without a warrant, a complaint shall be filed forthwith which shall comply with the requirements of Rule 4(a) with respect to the showing of probable cause.

It is long-settled law in Delaware that a detention of more than 24 hours is unreasonable and will lead to the exclusion of the evidence obtained during such illegal detention. *Vorhauer v. State*, 59 Del. 35, 212 A.2d 886 (1965). Under certain circumstances, a delay of less than 24 hours may be unreasonable leading to the same result of evidence exclusion. *Webster v. State*, 59 Del. 54, 213 A.2d 298 (1965).

But no clear-cut standards of reasonableness may be prescribed. Each case must be considered by the trial judge on its own facts; and the number of hours of detention before a Justice of the Peace is to be considered by the trial judge, together with all of the other circumstances of the case, in determining whether the delay was unreasonable.

*Webster*, 213 A.2d at 301; *accord Hopkins v. State*, Del.Supr., 501 A.2d 774 (1985).

In *Webster*, the defendant came into state police custody at 8:45 p.m. Soon thereafter, that defendant was taken to the hospital for treatment of injuries received during the altercation which ultimately lead to her arrest for murder second degree and conviction of involuntary manslaughter. She returned to the state police troop at 10:45 p.m. The officers investigating the case returned at 11:45 p.m. and started to question her around 12:15 a.m. ending around 3:00 a.m., punctuated with fulfilling her requests to get clothing and eyeglasses. In light of this brief delay, the ongoing investigation and the obvious logic of having the investigating officers question her, the Supreme Court affirmed the trial court's determination that the delay was not unreasonable. *Webster*, 213 A.2d at 302.

In *Weekley v. State*, Del.Supr., 222 A.2d 781 (1966), three defendants, suspected of killing a state policeman several days before, came into police custody at 5:30 p.m. One defendant took time to point out where some weapons could be located. All three gave statements ending around 9:30 p.m. This interval was determined to be not an unreasonable delay. *Weekley*, 222 A.2d at 787.

In *Fullman v. State*, Del.Supr., 389 A.2d 1292 (1978) *reversed on other grounds Davis v. State*, Del.Supr., 400 A.2d 292 (1979), the defendant voluntarily surrendered himself in connection with the non-fatal shooting of a Wilmington Police officer at 1:00 a.m. on a Sunday morning. He was questioned for about an hour in the presence of his parents and during other conversations, to which his parents were also present, agreed to take a polygraph. He was arrested on a Superior Court capias during those times but there were no means to return the capias until Monday morning.

After that defendant agreed to a polygraph test, he was returned to his cell where he slept. The test was scheduled for 11:00 a.m. on Sunday and his parents returned to the police station and were allowed to talk to him. It was their desire to have a polygraph. The test started at 1:00 p.m. and ran for three hours, including a half-hour break. At 5:30 p.m. a prosecutor and an investigating officer, had what they believed was overwhelming evidence against this defendant. The atmosphere was cordial. While the Court's opinion does not recite whether this defendant had been advised of his *Miranda* rights before this 5:30 p.m. interview, he had been advised of them prior to his initial questioning and again before the polygraph.

The defendant's questioning was discontinued at 7:00 p.m. and his girlfriend brought him food which he ate. Between 9:30 p.m. and 10:00 p.m. further questioning was undertaken, prefaced by *Miranda* warnings, and defendant then implicated himself. In holding that an unreasonable delay had not occurred, the Supreme Court emphasized (1) defendant's voluntary surrender, (2) the 3:00 a.m. to 11:00 a.m. interval when he was resting, (3) the 11:00 a.m. to 4:00 p.m. interval for the preliminaries to and the administration of the polygraph, and (4) particularly that defendant had requested the polygraph. That Court attributed five to six hours of delay to the police after subtracting sleep and polygraph times. That delay was not unreasonable. *Fullman*, 389 A.2d at 1298.

In *Deputy v. State*, Del.Supr., 500 A.2d 581 (1985), the Court determined that there had not been an unreasonable delay. Deputy was arrested at 3:15 p.m., arrived at a state police barracks at 4:00 p.m. where he and a suspected homicide codefendant were questioned. He was advised of his *Miranda* rights but did not request a lawyer. Apparently, he said nothing incriminating but due to other evidence, he was arrested for murder at 4:30 p.m.

After eating dinner, questioning resumed after 7:00 p.m. The state police officer questioning Deputy told him that he did not believe he was telling the truth. Deputy consented to the officer's request to take a polygraph. Due to a snow storm and the desire for further questioning, the defendant was kept overnight in a police station and not taken to a magistrate.

The test started the next day around 9:00 a.m. Deputy was advised of his *Miranda*

rights again and he did not request a lawyer. Prior to the polygraph, he was readvised of his *Miranda* rights. After the test, the operator indicated Deputy had "failed" and then Deputy gave an incriminating statement.

The Supreme Court noted in holding an unreasonable delay had not occurred that (1) the atmosphere between Deputy and the police was cordial, (2) Deputy had rested for twelve out of the twenty hours while awaiting a polygraph, and (3) the police were chargeable with only three to four hours of questioning during the twenty hours. *Deputy*, 500 A.2d at 589.

In *Hopkins v. State*, Del.Supr., 501 A.2d 774 (1985), the Court determined that an eight hour delay between arrest and interrogation was not unreasonable. The reasons were that the arresting officer, also the chief investigating officer, was the questioning officer and he had been involved in a time-consuming search and the making out of a return involving drugs and much material seized pursuant to a warrant. The Court deemed it appropriate that he question the defendant and that under all these circumstances the delay was not unreasonable. *Hopkins*, 501 A.2d 777.

The defendant in this case was arrested around 12:45 a.m. for driving under the influence. He was rearrested for the same charge around 3:00 a.m. Municipal Court, where he would have been taken, did not open for business until 9:00 a.m. Detaining for too long a person arrested for driving under the influence, under certain circumstances (where state of sobriety, appearance, demeanor and other factors are not unfavorable to the accused) can and will be considered as unreasonable delay. *Warren v. State*, Del.Supr., 385 A.2d 137, 142 (1978), *reversed on other grounds Roberts v. State*, Del.Supr., 494 A.2d 156 (1985).

The defendant had made some form of statement to Brown at 3:00 a.m. Following that, Brown resumed his investigation at the scene. By 4:30–5:00 a.m. he had enough information to arrest the defendant for vehicular homicide but was being repeatedly told by his superiors to wait. When Brown questioned the defendant around 6:40 a.m., the right to counsel was invoked before much was said. Brown returned to the accident scene to check some matters in the daylight. The record reveals that this did not add to his knowledge for the arrest. By the time he returned to the police station, Municipal Court had opened.

After 6:40 a.m. there was no contact with the defendant for nearly six hours, three and one-half of which occurred after Municipal Court opened. The blood test was initiated at the request of the prosecutors unlike the polygraph sought in *Fullman*. The blood test undertaken after 12:30 p.m., nearly twelve hours after the defendant's arrest and six hours after the initial police prosecutor contact, could have been performed at any time, whether at Wilmington Hospital or elsewhere. The defendant was not detained, to his knowledge, or resting *pending* his blood test. Compare to the situations involving the polygraphs in *Fullman* and *Deputy*.

The State offers no explanation for the delay between 6:40 a.m., or 4:30–5:00 a.m. and 1:30 p.m. other than the prosecutors talking to a witness. An experienced police officer in fatal investigations had enough probable cause, he believed, for an arrest and he did not need the defendant's further statement. However, once he had basically concluded his investigation between 3:00 a.m. and 6:00 a.m., he certainly was entitled to try to question the defendant. He was like the chief investigating officers in *Webster* and *Hopkins* who were the appropriate officers to question this defendant, which, as noted, occurred after initial investigations. His final attempt was unsuccessful but, unlike *Hopkins*, the delay after 6:40 a.m. was not due to his continuing investigation, looking forward to further questioning because of the request for a lawyer which he knew ended questioning.

While the atmosphere between Brown and the defendant was cordial, unlike *Fullman* and *Deputy* where that was a factor in deciding delays were not unreasonable, this defendant invoked his right to speak to

an attorney. This invocation differentiates this case from *Webster, Weekley, Fullman, Deputy* and *Hopkins.* Further, no effort was extended to comply with this request.

The delay chargeable to the State could start as early as 4:30–5:00 a.m. when Brown believed he had enough to arrest. It could start at 6:00 a.m. when he had his initial contact with a prosecutor, as far as the vehicular homicide charge. If the time from Wisher's arrest for driving under the influence at 12:45 a.m. is added, the delay becomes much longer.

Under the circumstances of this case, even the approximate seven-hour delay between the abbreviated statement and going to the Attorney General's Office was unreasonable. As the Supreme Court emphasized in *Fullman* that it was the *defendant's* request for the polygraph which weighed heavily in its decision, this Court weighs heavily the invocation of defendant's right to counsel and no convincing need shown for any further delay thereafter in taking this defendant to a committing magistrate or Municipal Court in determining that the delay here was unreasonable.

Further, even though Municipal Court was not open at 6:40 a.m., there is nothing in this record to show why the defendant could not have been taken there at 9:00 a.m. While Brown did not return to the scene after 6:40 a.m., he already had enough in his mind as an experienced officer to arrest the defendant. The blood test could have been taken between 6:40 a.m. and 9:00 a.m. There are none of the compelling factors here as in *Webster, Weekley, Fullman, Deputy* and *Hopkins* to explain the delay.

The statement taken at the Attorney General's Office between 1:45 p.m. and 2:15 p.m. was taken during that unreasonable delay and, therefore, the motion to suppress this statement due to unreasonable delay is GRANTED and the statement is hereby SUPPRESSED.

## V

Even though the last statement given by the defendant is suppressed for the reasons indicated above, the second ground for its suppression raises constitutional issues serious enough to be addressed.

Defendant's second ground for suppressing his statement in the Attorney General's office is that it was taken in violation of his Fifth Amendment right to counsel. Since there had been no initial judicial proceeding initiated by this defendant, the analysis is whether his Fifth Amendment right to counsel, contrasted to his Sixth Amendment right to counsel, attached. *Deputy,* 500 A.2d 581. The contention here is that once the defendant invoked his right to counsel, the subsequent statement in issue was taken when he had not knowingly and intelligently waived that right to counsel, which right he had invoked.

To determine the admissibility of this statement, the analsyses involved, in order, three determinations: (1) did the defendant actually invoke his right to counsel, (2) once it is determined that he did so, did further conversation occur when he initiated further communication, exchange or conversation with the police, and (3) did he knowingly and intelligently waive the right he had previously invoked. *Smith v. Illinois,* 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984); *Dodson v. State,* Del.Supr., 513 A.2d 761 (1986).

The undisputed testimony is that the defendant clearly invoked his right to counsel, after receiving his *Miranda* rights, when Brown started to interview him around 6:40 a.m. on August 2. Brown, acting properly, immediately ceased the interview, thus, the first prong has been met. It is also clear that during the next six plus hours, the defendant was not (1) provided an opportunity to contact a lawyer, and (2) no one, police officer or prosecutor, contacted an attorney or the Public Defender on behalf of the defendant.

Once this defendant invoked his right to counsel, he was not subject to further interrogation by law enforcement authorities, including prosecutors, until counsel had been made available to him or unless he initiated further communication,

exchanges or conversations with the police. *Edwards*, 451 U.S. at 485–86, 101 S.Ct. at 1885, 68 L.Ed.2d at 386–87.

Since no counsel was supplied, the analysis involves the two separate, further findings of whether the defendant initiated further conversations and whether he waived the right he had invoked previously. *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). The burden is on the prosecution to prove both steps. *Id.* at 1044, 103 S.Ct. at 2834, 77 L.Ed.2d at 411–12. The first part of the *Edwards* test must be considered before proceeding to consider whether there was a valid waiver. *Wainwright v. State*, 504 A.2d 1096, 1100 (1986).

Approximately six hours after invoking his right to counsel, Brown and Stewart came to the defendant's cell to take him to the Wilmington Hospital for a blood test.[1] The officers explained their purpose and on the drive to the hospital, explained that certain prosecutors, whom they named, had requested them to get the blood test.

Brown testified that he only discussed the blood test with the defendant and that, as best as he could recall, his conversation with Stewart at the hospital concerned only generalities of the accident and of accident investigation. The defendant testified that these conversations in his presence at the hospital involved statements about witnesses claiming the defendant was speeding and had gone through the red light. It was these statements to which he felt compelled to give his side of the story and asked to meet with the prosecutors. That request was followed by Brown's reminder that the defendant had invoked his right "not to speak to me".

In order to determine whether there had been an initiation by the defendant of further conversation with the police, it is unnecessary in this case to determine which version of the events occurred at the Wilmington Hospital. The police conversation was not interrogation in the traditional sense of asking questions, however, a non-interrogational conversation can amount to interrogation for purposes of *Miranda*. A practice that the police know is reasonably likely to invoke an incriminating response from a suspect is interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297, 308 (1980).

The Brown–Stewart conversations were not conversations they should have known would elicit an incriminating response. The officers were waiting for the phlebotomist, drinking coffee and generally discussing this accident. There is no indication that their discussion, under these circumstances, was one which they should have known would prompt the defendant to want to say something incriminating. Thus, the defendant's request to say something further was an initiation of a conversation with the police. *Compare Wainwright*, 504 A.2d 1096.

Having determined that the defendant initiated further conversations with the police, the final question is to determine whether the defendant knowingly and intelligently waived the right to counsel he had clearly invoked earlier.

Brown, to whom the defendant invoked his right to counsel, met with the prosecutors for a brief period prior to the taped statement being taken in the Attorney General's Office. The interview began with Walther reciting from memory *Miranda* rights:

> Mr. Coyle before we begin questioning you, I want to advise you of your Constitutional Rights.
>
> Q.1 You do understand that anything you say may be used against you in the court of law?
>
> A.1 Yes.
>
> Q.2 I'm going to ask you to speak up please, so we can pick it up on tape?
>
> A.2 Yes.
>
> Q.3 Do you understand that you have the right to remain silent?
>
> A.3 Yes sir.

---

**1.** The parties agree that since the blood sample was taken more than four hours after the last known driving of the defendant, any results relating to alcohol in his blood are inadmissible. 11 *Del.C.* § 3505.

Q.4 Do you understand that you have the right to have an attorney present with you during any questioning now or in the future?

A.4 Yes sir.

Q.5 Do you understand that if you cannot afford an attorney, the State will supply one to represent you?

A.5 Yes sir.

Q.6 Do you understand that you have the right to stop answering questions at anytime during the interview?

A.6 Yes sir.

Q.7 Are you now willing to speak with me after being advised of your rights that we have just discussed?

A.7 Yes.

Q.8 Have you been advised of your Constitutional Rights earlier today?

A.8 Yes.

Q.9 And do you recall who advised of your rights?

A.9 Yes.

Q.10 Who was it?

A.10 Officer on my left to me.

Q.11 Your pointing to Officer Brown?

A.11 Yes.

Q.12 Did you invoke at some point your right to remain· silent?

A.12 Yes I did.

Q.13 Did you later on decided that you wanted to speak to us?

A.13 Yes I did.

Q.14 Was it that at your request?

A.14 Yes.

The above colloquy indicates that Walther believed the defendant had invoked his right to remain silent. This is consistent with Brown's statement to the defendant at the hospital when he started to speak, reminding him that he had invoked his right not to speak to him. However, that is *not* the right which this defendant invoked, he invoked his right to counsel.

▮ The defendant had invoked his right to counsel to a police officer, thus, an investigatory agent of the State became clearly aware of the invocation. *Compare Alston v. State,* Del.Supr., 554 A.2d 304

(1989). This invocation must be imputed to the prosecutors. *See United States v. Porter,* 764 F.2d 1 (1st Cir.1985), *cert. denied,* 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987) (right asserted by attempting to contact attorney in presence of one DEA agent, knowledge imputed to DEA supervisor). Further, Brown had the opportunity to advise Walther of *what* right had been invoked and may have been the one who told him he had invoked his right to remain silent, prompting Walther's question addressed to that right. While the mistaken information may have been communicated in the best of faith, it was incorrect nonetheless.

It is also possible that Walther learned of an invocation of the right to remain silent earlier in the day when he met with several Wilmington Police officers. Brown was not present at that meeting. During the meeting since Walther was apparently told of the invocation of the right to silence, he cautioned the officers about the constrictions of *Edwards*. That cautionary advice was not communicated to Brown by his fellow officers.

The State has the burden of showing a knowing and intelligent waiver of the right which had been invoked. Walther mistakenly believed it was the right to remain silent and based on that belief, specifically asked about it. Unlike his specific follow-up question concerning the right to remain silent, he did not ask a specific follow-up question on the invocation of the right to counsel. This defendant had been in police custody by that time for over twelve and one-half hours from around 1:00 a.m. When put in the police car by Wisher, there is nothing in this record to show that he was any prior experience in the criminal justice system. No effort was made to contact a lawyer for him.

For these reasons, the State has failed to meet its burden that this defendant, prior to questioning in the Attorney General's Office, knowingly and intelligently waived the right to counsel he so clearly had previ-

ously invoked. Consequently, the motion to suppress the statement given in violation of *Miranda* and *Edwards* to the Attorney General's Office is GRANTED and is hereby SUPPRESSED.